[No. A037329. First Dist., Div. Three. June 27, 1988.]

JOHN ULLERY et al., Plaintiffs and Appellants, v. COUNTY OF CONTRA COSTA et al., Defendants and Respondents.

**COUNSEL**

Donald W. Curran and Curran & Alschuler for Plaintiffs and Appellants.

Allan DeFraga, Timothy J. Ryan, Gordon, DeFraga, Watrous & Pezzaglia, Kenton L. Alm, Sellar, Hazard, Snyder, Kelly & Fitzgerald, Gary M. Lepper and Stoddard, Lepper & Falco for Defendants and Respondents.

**OPINION**

**MERRILL, J.**—John Ullery and David Warwick filed a complaint for inverse condemnation against the County of Contra Costa (County), the City of Lafayette (City) and the Central Contra Costa Sanitary District (District) (hereinafter referred to collectively as the public entity defendants) for damage due to landslides which occurred on their respective parcels of real property. Following court trial, judgment in favor of the public entity defendants was entered. Ullery and Warwick appeal on the basis that the judgment is neither legally sound nor supported by substantial evidence.

I

Viewing the evidence in the light most favorable to the judgment, we set forth the following facts. (See *Crawford* v. *Southern Pacific Co.* (1935) 3

Cal.2d 427, 429 [45 P.2d 183].) Appellants are the owners of adjacent lots in City. Prior to incorporation into City in 1968, the properties were within unincorporated areas of County. The Ullery property is a south-facing hillside lot within one subdivision tract and the Warwick property is a north-facing hillside lot within another subdivision tract. Each lot is improved with a single-family dwelling. In 1978, a landslide occurred on the Ullery property. During the winters of 1982, 1983 and 1986, landslides occurred on both the Ullery and the Warwick property.

At the bottom of the two slopes, approximately parallel with appellants' common boundary and located entirely on the Warwick property, is a natural watercourse, the natural source of which is a 40-acre watershed. The watercourse is an intermittent natural stream. The developer of the Warwick property made an offer of dedication of a drainage easement within this watercourse but County expressly rejected such offer of dedication. Further, evidence presented at trial showed that neither County nor City performed any maintenance of the creek bed or banks on Warwick's property. Accordingly, the trial court found no implied acceptance of dedication in view of the insufficient proof that these public entities maintained, improved or controlled the easement within the Warwick watercourse.

Within the watershed area and upstream from the Warwick watercourse are improvements such as curbs, gutters, catch basins, cross-culverts. Under the public street bordering the Warwick residence is a culvert which empties onto the private Warwick watercourse. Such improvements were maintained by County prior to 1968 and by City after 1968. However, the trial court determined neither public entity had a duty to maintain the unimproved portion of the watercourse on the Warwick property. The trial court determined that the creek bed and bank of the watercourse on Warwick's property are privately owned and do not constitute a public use or improvement of County, City or District.

The trial court also found that County approved the tentative and final subdivision maps for both tracts but that such approval alone did not create liability for County.

During the development of both tracts, an underground sanitary sewer system was constructed on the properties. The District formally accepted the dedication of the sewers. An underground sewer main is located within a 10-foot-wide sewer easement on the Ullery property adjacent to the common boundary and parallel to the unaccepted drainage easement. The 1978 landslide included the slope shared with the sewer easement. After the 1978 landslide on Ullery's property, District abandoned the underground sewer

main and installed a temporary above-ground sewer line. Ullery attempted unsuccessfully to repair the damage to his property from the 1978 landslide.

A 1981 feasibility study conducted by District revealed that replacement of the subsurface main could not be performed absent repair of portions of the hillside outside the sewer easement. A proposal and cost analysis for repair of the hillside was prepared at District's request. However, after considering the proposal, both District and City concluded an expenditure of public funds for private purposes would be illegal and neither District nor City implemented the hillside repair proposal.

Testimony was received from appellants' expert, a geotechnician, to the effect that erosion within the creek channel was the cause of the landslides. In contrast, on behalf of respondent public entities, three expert geotechnical witnesses testified that a combination of numerous factors caused the earth movement on appellants' properties. However, erosion was not one of the causes. The trial court accepted this testimony and found that the landslides on the Ullery and Warwick lots were caused by "the nature of the soils, excessive rains (which raised the water table), expansive soils, and the manner in which private improvements (development of the lots, construction of the homes and the Ullery swimming pool) were made to the Ullery and Warwick properties, including the unsuccessful efforts undertaken by Ullery in 1978 to repair the landslide" on his property.

## II

*Public Use*

### A. *Drainage Easement*

██ ██ ██ ██ Appellants claim that County's and City's decision to reject dedication[1] of the drainage easement on Warwick's property should not permit these two public entities to escape liability for the landslide damage. Appellants submit that as the natural unimproved watercourse provides storm drainage for a 40-acre watershed, the trial court should have concluded that the drainage easement constituted a public use within the context of inverse condemnation liability. We conclude that substantial evidence supports the trial court's finding that the creek was not a public use or improvement within the context of inverse condemnation.

---

[1] Dedication is effected by the offer of a landowner to dedicate his land to a public purpose and the acceptance of that offer by the public. (*McKinney* v. *Ruderman* (1962) 203 Cal.App.2d 109, 115 [21 Cal.Rptr. 263].) Formal acceptance of a dedication is either by notation on the final map or by later resolution. (See Gov. Code, § 66477.3; *City of Santa Clara* v. *Ivancovich* (1941) 47 Cal.App.2d 502 [118 P.2d 303].)

The authority for prosecution of an inverse condemnation proceeding derives from article I, section 19 of the California Constitution (formerly art. I., § 14) which requires that just compensation be paid when private property is "taken or damaged for public use." ■ There is inverse condemnation liability for any physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not the injury was foreseeable and in the absence of fault by the public entity. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303-304 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129].)

One policy underlying this constitutional provision is to distribute throughout the community the loss inflicted upon the individual by the making of the public improvements. (*Varjabedian* v. *City of Madera* (1977) 20 Cal.3d 285, 296 [142 Cal.Rptr. 429, 572 P.2d 43].) Thus, an inverse condemnation action will fail if a plaintiff cannot establish that the public entity's conduct was in pursuance of a public use. (*Yox* v. *City of Whittier* (1986) 182 Cal.App.3d 347, 352 [227 Cal.Rptr. 311].)

The term "public use" within the meaning of this section may be " 'defined as a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government.' " (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at p. 352, quoting *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1]; *Marin* v. *City of San Rafael* (1980) 111 Cal.App.3d 591, 595 [168 Cal.Rptr. 750]; *Frustuck* v. *City of Fairfax* (1963) 212 Cal.App.2d 345, 358 [28 Cal.Rptr. 357].)

■ A storm drainage system constructed and maintained by a public entity is a public improvement. (*Souza* v. *Silver Development Co.* (1985) 164 Cal.App.3d 165, 170 [210 Cal.Rptr. 146].) A public entity is not insulated from liability by the fact that a part of the system may have been constructed by a private property owner. Where there has been at least implied approval or acceptance of the work by a public entity, there is inverse condemnation liability for the taking or damage proximately caused by the drainage system. (*Ibid.*; *Marin* v. *City of San Rafael, supra,* 111 Cal.App.3d at p. 595.) Official acts of dominion and control constituting acceptance of the private drainage system can be shown if the public entity does maintenance and repair work. (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at p. 354; see also *Ackley* v. *City etc. of San Francisco* (1970) 11 Cal.App.3d 108, 113-114 [89 Cal.Rptr. 480]; *Ellison* v. *San Buenaventura* (1976) 60 Cal.App.3d 453 [131 Cal.Rptr. 433].) Use of land for a public purpose over time may constitute implied acceptance of the offer of dedication. (*Marin* v. *City of San Rafael, supra,* 111 Cal.App.3d at p. 596.) On the other hand, where "there is no acceptance of a street or the drainage system within it,

there is no public improvement, public work or public use and therefore there can be no public liability for inverse condemnation." (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at p. 354, fn. omitted.)

The opinions of *Yox* and *Marin* reveal the level of dominion and control required for implied acceptance or approval of a drainage system. In *Yox,* the plaintiffs filed an inverse condemnation action against the city of Whittier for damage allegedly caused by unreasonable and excessive use of the natural easement for runoff surface water from two uphill lots. Plaintiffs' lot and the two uphill lots were all located on a private street. There was no offer of dedication nor formal acceptance of the street or the drainage system by the city. Further, the city's subdivision approval was conditioned on the private property owners' execution of an agreement to maintain the roadway and provide drainage of the lots and street so as not to cause damage to adjoining properties. The Court of Appeal affirmed the trial court's grant of summary judgment in favor of the city. The court held inverse condemnation liability did not lie in this case as neither public use nor public maintenance of the private watercourse was demonstrated by the evidence. (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at pp. 354-355.)

On the other hand, the *Marin* opinion found that a public use of storm drainage system located on private property was implied from the circumstances of that case. There the Court of Appeal reversed the judgment of the trial court, sitting without a jury, in favor of the defendant public entity. A previous owner of the property had laid a subsurface storm drain pipe in the location of a natural watercourse running downhill. Pipes and catch basins installed by the city emptied their waters into this privately constructed improvement. The trial court concluded that there was no inverse condemnation liability, in spite of the city's concession at trial that the pipe was part of the storm drainage system. However, the Court of Appeal held as a matter of law that plaintiffs' property damage was proximately caused by the city's maintenance and use of a public improvement as deliberately designed and planned by the city. The *Marin* court found it significant that the city's engineer supervised and directed installation of the private drainage pipe, that the city knowingly and continuously used the pipe for drainage purposes over many years and that the privately installed pipe was part of the municipal storm drainage system. (*Marin* v. *City of San Rafael, supra,* 111 Cal.App.3d at pp. 593-596.)

Unlike the facts in *Marin,* here the County and City took no affirmative steps exhibiting dominion and control over the Warwick creek. No employees or agents of these public entities participated in any improvement, maintenance or repair of the creek. The public entities and the public at large had no right of access to the creek. As it was located on his private

property, Warwick was free to exclude members of the public from enjoying any use of the creek. By expressly rejecting the offer of dedication, the public entities demonstrated they were foregoing any public use of the property. Although the creek was a part of the drainage system which drained a 40-acre watershed, the absence of dominion and control exhibited by the public entities, supports the trial court's finding of no public use. The evidence in this case establishes neither express nor implied acceptance of the dedication offer.

### B. *Subdivision Map Approval*

Moreover, contrary to appellants' argument, a public use or improvement is not shown by County's subdivision map approval of the two tracts in question here. Appellants argue that pursuant to the Subdivision Map Act (Gov. Code, § 66411), local governments are vested with the power to control and regulate the design of subdivisions. Thus, the argument continues, County's approval in the instant case of the tentative and final subdivision maps resulted in creating a "residential environment" conducive to landslide damage.

■ However, inverse condemnation liability will not lie for damage to private property allegedly caused by private development approved or authorized by the public entity, "where the [public entity's] sole affirmative action was the issuance of permits and approval of the subdivision map." (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at p. 353.) In *Yox,* liability in inverse condemnation was asserted for the city's issuance of permits and approval of allegedly defective design plans for a privately built development on a private street. The plaintiffs there contended that inverse condemnation was established as subdivision map approval could be analogized to acceptance of an offer of dedication. However, the Court of Appeal concluded that the permit issuance and subdivision map approval alone did not constitute a public use. "Approval of a subdivision map does not constitute such an acceptance of a pathway even when the street has been offered therein for dedication to the public use by the private owner." (*Id.,* at pp. 354-355, citing *Ackley* v. *City etc. of San Francisco, supra,* 11 Cal.App.3d at p. 111.)

Similarly, in *Ellison* v. *City of San Buenaventura* (1976) 60 Cal.App.3d 453 [131 Cal.Rptr. 433], a case relied upon by the *Yox* court, an argument analogous to that presented by the appellants here was also rejected. In *Ellison,* the court held the city was not liable to a downstream property owner for sediment buildup at a faster rate than would have occurred without the upstream development authorized by the city. As the city "played no part [in the private development of the upstream property] other

than [the] approval of plans and issuance of permits," the plaintiff's claim for damages was not actionable. (*Id.,* at p. 459.)

Likewise, we find no error in the trial court's conclusion that County's subdivision map approval "alone created no [inverse condemnation] liability." The development in question was by private parties on private property. As we have stated, there is no evidence in the record to the effect that County performed any affirmative acts on the private property.[2] County's sole participation in the development process was approval of the tentative and final subdivision maps. This alone is not enough to give rise to establish inverse condemnation liability.

Appellants misconstrue the law when they state that the subdivision map approval process represents a sufficient level of governmental involvement to constitute a public use or improvement subjecting the public entity to inverse condemnation liability. The cases do not stand for the proposition that approval alone creates liability in inverse condemnation. The case of *Frustuck* v. *City of Fairfax, supra,* 212 Cal.App.2d 345, upon which appellants rely, is distinguishable from the instant case. The court there held "approval of the subdivision maps and plans which include drainage systems . . . constitute a substantial participation incident to the serving of a public purpose. Such drainage systems when accepted and approved by the City become a public improvement and part of its system of public works." (*Id.,* at p. 362.) However, *Frustuck* involved private property damage as a result of the public entity's approval of significant upstream development, improvements which diverted storm waters from natural channels, and enlargement of facilities which caused water to flow onto plaintiff's property. (*Id.,* at pp. 360-364.) Here, the County did not approve or actively construct a drainage system which diverted waters onto appellants' property.

Further, in *Sheffet* v. *County of Los Angeles* (1970) 3 Cal.App.3d 720, 735 [84 Cal.Rptr. 11], another case cited by appellants, the court held the county was liable in inverse condemnation for damages from overflow of surface waters from public streets onto plaintiff's property where the county had approved the subdivision, including the drainage system, and damage to adjacent property resulted from the improvements. In contrast to the case at bench, the county in *Sheffet* accepted dedication of the privately constructed improvement, i.e., the streets, and thus became liable for the damages caused by improper construction and inadequate drainage thereon. Neither of these cases held the public entity liable for inverse condemnation by virtue of the sole act of subdivision map approval.

[2] Appellants do not contend that District is subject to inverse condemnation liability for subdivision map approval.

V

■ Finally we conclude that even if the creek may be considered a public use or improvement, substantial evidence supports the trial court's finding that erosion from this watercourse was not a proximate cause of the landslides.

■ In order for liability in inverse condemnation to lie, a causal connection must exist between the defendant public entity's conduct and plaintiff's damages. (*Souza* v. *Silver Development Co., supra,* 164 Cal.App.3d at p. 171.) The public use or improvement need not be the sole cause of the property damage. Liability in inverse condemnation may be shown where the public improvement was a substantial concurring cause of the damage. (*Blau* v. *City of Los Angeles* (1973) 32 Cal.App.3d 77, 84-85 [107 Cal.Rptr. 727], citing Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 435-438.) There must be a showing of " 'a substantial cause-and-effect relationship excluding the probability that other forces *alone* produced the injury.' [Citations.]" (*Souza* v. *Silver Development Co., supra,* 164 Cal.App.3d at p. 171, fn. omitted.)

■ Further, we take into consideration the oft-stated rule that " 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [trial court's] conclusion' . . . . Furthermore, 'in a case tried without a jury, the trial judge is the sole arbiter of all conflicts in evidence, . . . [and] he [or she] may draw or may refuse to draw inferences reasonably deducible from the evidence.' [Citations.]" *(McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683, 699 [194 Cal.Rptr. 582].)

■ Clearly substantial evidence supports the trial court's conclusion that erosion within the creek channel was not a cause of the landslides. Testimony showed that creation of the upstream improvements in the form of catch basins and culverts did not increase the flow of water into the creek. One expert witness, a geotechnical engineer, stated that the landslides were not caused by the creek. Respondents' expert geotechnical witnesses testified that a combination of numerous factors caused the earth movement on appellants' properties, none of which was erosion. In contrast, appellants' expert testified that erosion in the creek bed was a cause of the earth movement. As the trier of fact, the trial court rejected the testimony of appellants' expert witness and chose instead to accept the testimony that the damage was caused by the nature of the soils, excessive rains, expansive soils, and the manner in which private improvements were made to the Ullery and Warwick properties. As the trial court's conclusion as to causa-

tion was reasonably deducible from the evidence, we will not disturb such determination on appeal.

 In light of our conclusion, we need not consider respondents' additional position that the natural watercourse rule immunizes them from any liability in this case.[3]

The judgment is affirmed.

White, P. J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied July 25, 1988, and appellants' petition for review by the Supreme Court was denied September 14, 1988.

---

[3]The natural watercourse rule immunizes upper landowners from liability for damages to lower landowners from increased discharge into a natural watercourse, i.e., a running stream of water. (*Steiger* v. *City of San Diego* (1958) 163 Cal.App.2d 110, 114 [329 P.2d 94].) This common law rule provides that "an improvement for the purposes of drainage of lands above does not give a lower riparian owner on the stream a cause of action merely because the improvement increases the volume of water coming to his land in the stream with the incidents necessarily accompanying such increase of volume, but without affecting the stream in any other manner." (*San Gabriel V. C. Club* v. *Los Angeles* (1920) 182 Cal. 392, 404 [188 P. 554, 9 A.L.R. 1200]; see also *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 24-25 [119 P.2d 1]; *Ellison* v. *City of San Buenaventura, supra,* 60 Cal.App.3d at p. 457.) The immunity provided by this decisional rule is inapplicable where the upstream improvements divert water out of the natural channel. (*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d at p. 26.)