Filed 6/24/21  Mass v. City of San Diego CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| HOWARD J. MASS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>CITY OF SAN DIEGO,<br><br>    Defendant and Respondent. | D077307<br><br><br>(Super. Ct. No. 37-2018-00009001-CU-EI-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

David A. Kay, for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Tyler L. Krentz, Deputy City Attorney, for Defendant and Respondent.


Plaintiffs Howard J. Mass, Nancy M. Mass, and Jeanine Coffman (together Plaintiffs) appeal from a judgment in favor of defendant City of San Diego (the City), following the grant of the City's motion for summary judgment.

In the underlying complaint, Plaintiffs alleged that the City improperly "approved[,] designed, constructed, maintained, modified, repaired, controlled, and/or caused to be constructed" a "brow ditch"[1] on their residential properties. Plaintiffs sued the City for damages and injunctive relief when, following a severe rainstorm in 2017, a portion of the brow ditch on their properties was undermined, which washed water, mud, and debris into their backyards.

In granting summary judgment, the trial court ruled that the City met its initial burden of producing a prima facie showing of a complete defense to all the claims—namely, that the brow ditch was not a public improvement— and that Plaintiffs did not meet their responsive burden of establishing a triable issue of material fact. Because, as we explain, Plaintiffs have not shown on appeal that the brow ditch either provides a legally cognizable public benefit or is a public improvement, they did not establish reversible error. Accordingly, we will affirm the judgment.

---

[1] The City tells us that a "brow ditch" is "a small concrete open trench that catches and channels surface water." Plaintiffs do not explain otherwise. For purposes of this opinion, we accept the City's definition.

2

## I.  FACTUAL BACKGROUND[2]

A.    *The Parties and Plaintiffs' Properties*[3]

In 1963, in approving Subdivision Map No. 5280, the City created the College Valley Subdivision (College Valley) in the College Area of San Diego south of San Diego State University.  In their complaint, Plaintiffs allege that they own two properties in College Valley on Maisel Way in San Diego (Plaintiffs' Properties):  plaintiffs Mass own lot 19 with a street address of 5463 Maisel Way (Mass property); and plaintiff Coffman owns lot 18 with a street address of 5455 Maisel Way (Coffman property).

Plaintiffs' Properties are next to each other in the middle of the block on the south side of Maisel Way, a small cul-de-sac with fewer than 10 lots on the south side of the street, with the Mass property directly to the east of the Coffman property.  Both backyards, as well as other backyards on the south side of Maisel Way, have a steep uphill area which contains a concrete brow ditch that runs horizontally near the top of the hill.  The flow of the brow ditch is from east to west and runs primarily straight across the hillside, except for a small portion on the Coffman property which curves back and forth.  The curved portion of the brow ditch was part of a 1996 repair of the (formerly straight) brow ditch, which the City performed when a City sewer

---

[2]    " 'Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717 (*Wilson*).)

[3]    For our understanding and description of the real estate involved, we principally rely on the maps found at pages 96 (aerial photograph), 154-156 (Map No. 5280), and 158-159 (Map No. 2818) of the appellants' appendix. Because the parties are familiar with the record, there is no need to reproduce them in this opinion.

main failed, causing damage to the brow ditch. (See pt. I.C., *post*.) At the time, the owners of the Coffman property (plaintiff Coffman and her husband) authorized the City to perform the repairs to the property.

Across the southern border of Plaintiffs' Properties on the southern side of Maisel Way (and thus across the southern boundary of College Valley) is the northern boundary of the El Cerrito Heights Unit No. 4 Subdivision (El Cerrito Heights). The City earlier created this subdivision in 1951 by its approval of Map No. 2818. The northern boundary of El Cerrito Heights— which backs up to and is at a higher elevation than Plaintiffs' Properties—is the southern boundary of College Valley. Lots 12 and 13 of El Cerrito Heights, which abut Plaintiffs' Properties in College Valley to the north, are the last two lots on a short cul-de-sac on Redland Place, which contains only six lots on the north side of the street.

B.    *The February 2017 Incident*

On February 28, 2017, during a heavy rainstorm, a part of the concrete brow ditch failed. In their complaint, Plaintiffs allege that this failure of the brow ditch caused damage to each of Plaintiffs' Properties (February 2017 Incident). The part of the brow ditch that failed in the February 2017 Incident is east (upstream) of the portion of the brow ditch that the City repaired in 1996 when its sewer main failed. (See pt. I.C., *post*.)

C.    *The History of the Brow Ditch*

The brow ditch is located on private property and drains runoff only from private property.[4] The parties agree that a private party constructed

---

[4]    The City presented evidence that supported a proposed undisputed fact that the brow ditch only drains runoff from private property in El Cerrito Heights. Plaintiffs disputed this evidence by stating that they do not know the source of the water that is collected and flows through the brow ditch.

the brow ditch, likely as part of the development of College Valley.  According to Plaintiffs' expert, "th[e] brow ditch would have been constructed as part of the improvements for the subdivision, and those are usually done by the private developer."

There is no evidence that the City ever planned, installed, or regularly maintained the brow ditch.  The evidence further establishes that there are no records that the City ever "constructed a concrete brow ditch" in or near Plaintiffs' Properties.

Similarly, the City's Storm Water Division database does not have any records that the City either operated or maintained a concrete brow ditch in or near the backyards of Plaintiffs' Properties.  Likewise, the City's Transportation and Storm Water Department does not have a record of any maintenance ever having been scheduled for that brow ditch.  This is consistent with the fact that the City has no legal access to reach the brow ditch on Plaintiffs' Properties.

There is no evidence that anyone attempted to dedicate the brow ditch to the City or that the City ever attempted to accept a dedication of the brow ditch.[5]

---

Such a response does not result in a disputed fact for summary judgment purposes.  (See *Kojababian v. Genuine Home Loans, Inc.* (2009) 174 Cal.App.4th 408, 419 (*Kojababian*) [where a party does not have evidence to oppose summary judgment, but believes it exists, the party must seek a continuance].)

[5]     Dedication is "a grant and a gift of an interest in land by a private owner for the public use." (*Yox v. City of Whittier* (1986) 182 Cal.App.3d 347, 353, fn. 4 (*Yox*).)  It may occur by statute or by common law. (*Mikkelsen v. Hansen* (2019) 31 Cal.App.5th 170, 175.)  "Dedication of private property for public use requires an offer of dedication by the owner and an acceptance of the offer by the public entity." (*Yox*, at p. 353, fn. 4.)

El Cerrito Heights (Map No. 2818) contains a four-foot undefined easement which circles the entire subdivision—i.e., not just the northwestern-most lots which abut the southern boundary of College Valley where the brow ditch and Plaintiffs' Properties were built many years later. It is not labeled as a "drainage easement," although drainage easements are typically labeled as such, and other easements on the map contain such a label. In short, the brow ditch in College Valley is not located within the four-foot undefined easement in El Cerrito Heights.

College Valley does not have a public easement at the location of the brow ditch. To the extent College Valley benefits from the brow ditch, only a select few lots, including Plaintiffs' Properties, are potentially affected.

The brow ditch does not connect to any upstream public drainage facility or drain water from any public drainage facility.[6] The only City facility near the brow ditch is an underground sewer main. This sewer main runs north-south and is located between College Valley lots 18 (the Coffman property) and 17 (the lot to the west of the Coffman property).

In 1996, a different City sewer main failed, causing damage to a part of the brow ditch located in the Coffman Property—i.e., to the west (downstream) of the part that failed in the February 2017 Incident. The City hired a contractor both to clean up damage from the failed sewer main and to repair the damaged part of the brow ditch. The City requested, and Coffman gave, written permission to the City's contractor to go onto the Coffman property to effect the clean-up and repairs. The repaired part of the brow

---

[6] Plaintiffs dispute this evidence by again stating that they do not know the source of the water that is collected and flows through the brow ditch. Such a response does not result in a disputed fact for summary judgment purposes. (See *Kojababian*, *supra*, 174 Cal.App.4th at p. 419.)

6

ditch curves to the south and back to the north (like a "U"), whereas the rest of the original brow ditch runs in a straight line (downstream from east to west).

On four or five occasions between 1981 and 1987, two to three City workers cleaned out surface debris in that part of the brow ditch that traverses the few lots on the south side of Maisel Way.

Since then, the evidence is that only private property owners, including Plaintiffs and others, cleaned, maintained, and repaired the brow ditch. For example, prior to the February 2017 Incident, one of Plaintiffs cleaned the brow ditch "multiple times"; and another of Plaintiffs and her husband cleaned the brow ditch "about ten to 15 times," including hiring a professional company on at least one occasion. Also, "a bunch of times through the years," one of Plaintiffs' neighbors hired another neighbor to clean the brow ditch. In the late 1990's or early 2000's, one of Plaintiffs installed a fiberglass bridge to repair a portion of the brow ditch in her yard. Prior to the February 2017 Incident, one of Plaintiffs' neighbors reinforced a section of the brow ditch with more dirt. In addition, "[m]ost likely before the [February] 2017 [I]ncident," one of Plaintiffs patched a hole in the brow ditch in her yard with foam and concrete. Finally, approximately two weeks after the February 2017 Incident, another of Plaintiffs installed a 40-foot pipe "into the brow ditch to try to regain some of the drainage."

At no time did any of Plaintiffs ask the City for permission to clean or repair the brow ditch, seek help from the City with cleaning or repairing the brow ditch, or (prior to the present litigation) complain to the City about cleaning or repairing the brow ditch.

7

## II. PROCEDURAL BACKGROUND

In February 2018, Plaintiffs filed the underlying action. They sued the City for damages and an injunction, alleging causes of action for condemnation, nuisance, trespass, and injunctive relief,[7] based on the injuries they alleged they suffered as a result of the February 2017 Incident. All of Plaintiffs' claims are based on the allegations that the City "approved[,] designed, constructed, maintained, modified, repaired, controlled, and/or caused to be constructed said brow ditch, and that the brow ditch is in the wrong location." According to the complaint, as a "direct and proximate result of the City planning, approving, constructing, maintaining, modifying, repairing and/or operating the brow ditch," following the February 2017 Incident, "a large portion of the brow ditch at [Plaintiffs' Properties] was undermined and water, mud and debris washed down into the backyard of each property, causing damage."

In answering the complaint, the City filed a general denial and asserted a number of affirmative defenses, including that the City "did not and does not own, operate or control the brow ditch that caused Plaintiffs' harm."

The City moved for summary judgment (as to the complaint) or, alternatively, summary adjudication (as to each of the causes of action) on the following grounds: (1) The brow ditch is not a public improvement as a matter of law; and, independently, (2) Plaintiffs cannot prove that the City's conduct caused the failure of the brow ditch. With regard to the cause of

---

[7] " 'Injunctive relief is a remedy, not a cause of action.' " (*Guessous v. Chrome Hearts, LLC* (2009) 179 Cal.App.4th 1177, 1187; accord, *Art Movers, Inc. v. Ni West, Inc.* (1992) 3 Cal.App.4th 640, 647 [an injunction "is merely a remedy for a proven cause of action"].)

8

action for inverse condemnation, the City also sought summary adjudication for the additional reason that the brow ditch does not serve a public use.

Following briefing and oral argument, the trial court granted the City's motion for summary judgment. In short, the court ruled that, because "the undisputed material facts demonstrate [the City] did not design, construct or maintain the subject brow ditch[,] . . . the City is not liable[.]"[8]

The court entered a judgment in favor of the City and against Plaintiffs, and Plaintiffs timely appealed.

### III. DISCUSSION

Plaintiffs argue that the trial court erred, since they presented triable issues of material fact as to: whether the brow ditch provided a public benefit; and whether the City explicitly or implicitly approved or accepted the brow ditch. As we explain, Plaintiffs have not met their burden of establishing reversible error.

A. *Summary Judgment Standards*

Because the trial court's judgment is presumed correct, Plaintiffs (as the appellants) have the burden of affirmatively establishing reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers[.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; accord, *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) We liberally construe and reasonably deduce inferences from the opposing party's evidence, resolving any doubts in the evidence in

---

[8] The trial court also overruled the Plaintiffs' evidentiary objections. There is no argument on appeal that the court erred in its evidentiary rulings.

that party's favor. (*Wilson*, *supra*, 42 Cal.4th at p. 717; Code Civ. Proc., § 437c, subd. (c); further unidentified statutory references are to the Code of Civil Procedure.) This rule of liberal construction also applies to expert testimony and, in particular, " 'its sufficiency to create a triable issue of fact.' " (*Michaels v. Greenberg Traurig, LLP* (2021) 62 Cal.App.5th 512, 524 (*Michaels*).)

A defendant is entitled to a summary judgment on the basis that the "action has no merit" (§ 437c, subd. (a)) only where the court is able to determine from the evidence presented that "there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" (§ 437c, subd. (c)). A cause of action "has no merit" if one or more of the elements of the cause of action cannot be established or an affirmative defense to the cause of action can be established as a matter of law. (§ 437c, subd. (o).)

Thus, the moving defendant has the ultimate burden of *persuasion*[9] that one or more elements of the cause of action at issue "cannot be established" or that "there is a complete defense to the cause of action." (§ 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at pp. 849-850, 853-854.) In attempting to achieve this goal, the defendant has the initial burden of *production*[10] to make a prima facie showing of the nonexistence of any

_____

[9]     The burden of persuasion, sometimes referred to as the burden of proof, means the obligation of a party "to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115.)

[10]     The burden of production means "the obligation of a party to introduce evidence sufficient to avoid a ruling against him on the issue." (Evid. Code, § 110.)

triable issue of material fact. (§ 437c, subd. (p)(2); *Aguilar*, at p. 850.) If the defendant meets this burden, then the burden of *production* shifts to the plaintiff to establish the existence of a triable issue of material fact. (§ 437c, subd. (p)(2); *Aguilar*, at pp. 850-851.)

B.    *Plaintiffs Did Not Meet Their Responsive Burden of Establishing the Existence of a Triable Issue of Material Fact*

As we explain, because Plaintiffs have not shown that the brow ditch either provides a legally cognizable public benefit or is a public improvement, they did not establish reversible error in granting the City's motion as to the cause of action for inverse condemnation.[11]

A claim for inverse condemnation derives from article I, section 19, of the California Constitution which requires that just compensation be paid when private property is "taken or damaged for public use."[12] (See *Belair v.*

---

[11]    Plaintiffs have forfeited appellate review of the judgment as to the remaining causes of action, because Plaintiffs did not present argument or authority as to any error regarding summary judgment/adjudication of the claims in those causes of action. (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1008 (*Trinity Risk Management*) [" ' "[w]hen an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived" ' "]; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 (*Delta Stewardship*) [where the appellant failed to provide "reasoned argument and citations to authority, we treat the point as forfeited"]; Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in a brief must be supported "by argument and, if possible, by citation of authority"].)

[12]    Article I, section 19, of the California Constitution does not define "public use." It does, however, define " 'Public work or improvement' " as "facilities or infrastructure for the delivery of public services such as . . . flood protection, . . . water-related and wastewater-related facilities or infrastructure . . . and private uses incidental to, or necessary for, the public work or improvement." (Cal. Const., art. I, § 19, subd. (e), par. 5.)

*Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558, 566 (*Belair*).)
Under inverse condemnation law, a public entity is responsible "for any physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not the injury was foreseeable and in the absence of fault by the public entity." (*Ullery v. County of Contra Costa* (1988) 202 Cal.App.3d 562, 568 (*Ullery*); accord, *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264.) To prevail on inverse condemnation, the property owner must show that " 'there was an invasion or appropriation (a "taking" or "damaging") by a public entity of some valuable property right possessed by the owner, directly and specially affecting the owner to his detriment.' " (*Ruiz v. County of San Diego* (2020) 47 Cal.App.5th 504, 514 (*Ruiz*).) A claim for inverse condemnation "includes within its purview actions for damages caused by the diversion of water from its natural course." (*Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345, 357.)

Because one policy underlying the constitutional provision of inverse condemnation is to distribute throughout the community the loss inflicted upon a private party by the making of a public improvement (*Belair*, *supra*, 47 Cal.3d at p. 558), the plaintiff in an inverse condemnation action can succeed only if the plaintiff can establish that the public entity's conduct was in the pursuit of a public use (*Yox*, *supra*, 182 Cal.App.3d at p. 352). In this context, "public use" is defined as " 'a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government.' " (*Ibid.*, quoting *Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284, abrogated on another point as stated in *Belair*, at p. 562; accord, *City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 69 [eminent

domain[13]].)  Whereas the concept of public use is a broad one that encompasses changing public needs (*City of Los Angeles*, *supra*, 194 Cal.App.4th at p. 221), it does not extend to private projects (*Cantu v. Pacific Gas & Electric Co.* (1987) 189 Cal.App.3d 160, 165).

For purposes of inverse condemnation, mere public use of a private structure, even for an extended period, does not result in a public improvement.  (*Ruiz*, *supra*, 47 Cal.App.5th at p. 518.)  An essential element for a claim of inverse condemnation arising out of damage from a public improvement is a showing that the public entity built, accepted, approved, or maintained the improvement that caused the damage to the private property owner.  (See *id.* at p. 517.)  Thus, a public entity is potentially liable for inverse condemnation only when the improvement is:  (1) developed by the public entity; (2) dedicated to the public entity by an offer of dedication and an acceptance of the offer; or (3) accepted by implication after being treated by the public entity as a public work.  (*Ibid.*; *Ullery*, *supra*, 202 Cal.App.3d at pp. 568-569; *Yox, supra*, 182 Cal.App.3d at pp. 352-354.)

---

[13]    In an eminent domain proceeding, the public entity initiates an action to acquire the defendant's property upon the payment of just compensation. (*City of Los Angeles v. Superior Court* (2011) 194 Cal.App.4th 210, 220.)  By contrast, an action for inverse condemnation is initiated by the property owner for the recovery of damage for the improper "taking" of the owner's property by some action of the public entity or by some cause for which the entity is responsible.  (*Ibid.*)  In either case, the property owner is entitled to recover just compensation measured by the fair market value of the property taken.  (*Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 203-204.)

Plaintiffs do not suggest either that the brow ditch was built by a public entity or that it was dedicated to and accepted by the City.[14] Consistently, the City's expert testified that it was his "professional opinion that the brow ditch only *benefits private property* and does not carry public water." (Italics added.)

Nonetheless, Plaintiffs argue that there are triable issues of material fact as to: whether the brow ditch served a public use or purpose, thereby creating a public improvement; and whether the City explicitly or implicitly accepted or approved the brow ditch.[15] As we explain, Plaintiffs did not meet their burden of establishing reversible error as to either issue.

---

[14]  In their appellate briefing, Plaintiffs acknowledge that "the City was not responsible for constructing" the brow ditch. In addition, Plaintiffs' expert testified that, when the brow ditch was originally constructed, a *private party* (the developer of College Valley) built it to collect water from a *private property* (El Cerrito Heights) and direct it west, eventually to the City's public system. Finally, Plaintiffs agree that, with regard to the brow ditch, there is no evidence of an attempted dedication to or an acceptance by the City.

[15]  Plaintiffs suggest that, by presenting expert testimony *rather than* "records showing whether or not [the City] expressly approved or accepted the brow ditch[,] . . . the City's expert opinion that there was no approval or acceptance of the brow ditch should be distrusted." (Citing Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust."].) We disagree. " '[Evidence Code s]ection 412 only applies when it can be shown that a party is in fact in possession of or has access to better and stronger evidence than was presented.' " (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 362.) Plaintiffs have not attempted to show that the "records" Plaintiffs describe exist, and Evidence Code section 412 "does not apply to evidence that does not exist." (*Ibid.*)

14

1.    *Public Use or Benefit*

Plaintiffs argue that, even though the City may not have *developed* or *built* the brow ditch, because it "served a public purpose by protecting a City sewer line or accepting runoff from City streets or a City easement," the City "*creat*[*ed*] *a public improvement.*"  (Italics added.)  We proceed with the understanding that, for purposes of this argument, Plaintiffs equate "public purpose" with "public use" or "public benefit."

a.    *City Sewer Line*

The only City facility near the brow ditch is the City's sewer main, which is underground.  Plaintiffs argue that there is a triable issue of material fact whether the brow ditch served a public purpose by protecting the sewer main.  We disagree.

In support of the City's motion for summary judgment, the City's expert testified in part as follows with regard to whether the brow ditch drains water from *public property*:

> "The concrete brow ditch is not an integral part of the City's storm drain system.  The concrete brow ditch accepts only runoff and surface water landing on the hillside during rain events or from the *private properties* [in El Cerrito Heights] to the south and uphill from Plaintiffs' properties.  No City drainage facility is located upstream of the brow ditch.  [¶] . . . [¶]

> "The concrete brow ditch does not protect the City's sewer main.  The sewer main is underground.  A brow ditch carries runoff and surface water, which would not affect an underground structure.  *The brow ditch would not offer any benefit to the City's sewer main.*"  (Italics added.)

In our de novo review, we conclude that, by the foregoing evidence, the City met its initial burden for summary judgment purposes.

15

At the deposition of Plaintiffs' expert, the expert testified that he reviewed the declaration of the City's expert, that he formed opinions regarding the declaration testimony, and that his opinions included:

- The above-quoted testimony from the City's expert "[wa]s accurate"; and

- Plaintiffs' expert had no disagreement "*with anything* that's in [the City's expert's] declaration" testimony. (Italics added.)

Elsewhere in his deposition, the expert described as follows how "an above-ground water conveyance system" like the brow ditch could "protect an underground pipe" like the sewer main:

> "Well, the underground pipe is on a steep slope going down. *If* water is allowed to drain over that area, even though the pipe is below ground, it would scour the trench that was made for the [sewer] pipe, as opposed to the natural grounds that are on either side of it. And so it *could potentially* erode down to the pipeline." (Italics added.)

Finally, with regard to the purpose of the brow ditch, in opposition to the City's summary judgment motion, Plaintiffs' expert testified:

> "One of the purposes for the brow ditch *appears to be* the protection of the sewer main line that exists between lots 17 and 18 of Map No. 5280 [College Valley] and is part of the sewer line that appears between lots 12 and 13 on Map No. 2818 [El Cerrito Heights]. This sewer line was constructed as part of the El Cerrito Heights . . . project as depicted on Map 2818." (Italics added.)

On appeal, Plaintiffs rely on the foregoing declaration testimony from their expert to establish a triable issue of fact. In our de novo review, as we explain, we conclude that, by this evidence, Plaintiffs did not meet their responsive burden to establish an issue of fact—on at least three bases.

First, public use of private property alone is insufficient to constitute implied acceptance of an improvement. (See *Ruiz, supra*, 47 Cal.App.5th at pp. 515-518 [collecting cases].) There must also be a sufficient showing of

16

official acts of dominion and control. (*Id.* at p. 518; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 370 (*Locklin*); *Ullery, supra,* 202 Cal.App.3d at p. 570 ["no public use" based on "the absence of dominion and control exhibited by the public entities"].) There has been no such showing here. (See pt. III.B.2., *post.*)

Second, we do not consider the following testimony from Plaintiffs' expert in opposition to the City's summary judgment: "One of the purposes for the brow ditch appears to be the protection of the sewer main line . . . ." That is because a party may not defeat summary judgment by means of declaration testimony which contradicts a witness's prior deposition testimony. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.) In application, this ruling by our Supreme Court allows the court to disregard a witness's summary judgment declaration testimony where it and the witness's prior deposition testimony are "contradictory and mutually exclusive." (*Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 863.) Here, at his deposition, Plaintiffs' expert testified: (1) He had read and considered both of the declarations from the City's experts in support of the City's summary judgment motion; (2) certain specific testimony in those declarations was "accurate"; and (3) he (Plaintiffs' expert) did not "disagree with anything that's in [either of the City's experts'] declaration[s]." Plaintiffs' expert's lack of disagreement included the following testimony from the City's expert's summary judgment declaration: "The concrete brow ditch does not protect the City's sewer main . . . [and] would not offer any benefit to the City's sewer main." Very simply, Plaintiffs' expert's declaration testimony that an apparent purpose of the brow ditch was the protection of the sewer main line contradicts and is mutually exclusive of Plaintiffs' expert's deposition testimony regarding the accuracy of, and his lack of

17

disagreement with, the statements that the brow ditch neither provides protection for or any benefit to the City's sewer main.

Third, even if we were to consider Plaintiffs' expert's testimony that one of the purposes of the brow ditch "*appears to be* the protection of the sewer main line" (italics added)—not that the brow ditch did protect the sewer pipe—the result would be no different. That is because, as the City contends, this evidence is "pure speculation" and "phrased in possibility, not fact." A " 'mere possibility is nothing more than speculation' "; and " '[s]peculation is not substantial evidence.' " (*People v. Wallace* (2017) 15 Cal.App.5th 82, 93 (*Wallace*); see *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*) ["Expert testimony must not be speculative"]; Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 801, p. 25 ["speculative matters are not a proper basis for an expert's opinion"].) Based on these standards, the above-quoted testimony on which Plaintiffs rely is not sufficiently substantial evidence to establish a triable issue of material fact as to whether the brow ditch served a public purpose by protecting the City's sewer main.[16]

Accordingly, Plaintiffs did not meet their responsive burden of presenting evidence that establishes a triable issue of material fact as to whether the brow ditch served a public purpose by protecting the sewer main.

_____

[16] We do not reach this conclusion lightly. We appreciate that " 'a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial.' " (*Michaels*, *supra*, 62 Cal.App.5th at p. 524.) However, here, the speculation contained in the opinion of Plaintiffs' expert is not evidence. (*Wallace*, *supra*, 15 Cal.App.5th at p. 93 [" ' " ' "substantial evidence" requires *evidence* and not mere speculation' " ' "].)

### b. *Runoff from City Streets or a City Easement*

Plaintiffs next argue that there is a triable issue of material fact as to whether the brow ditch served a public purpose by absorbing runoff from two different locations in El Cerrito Heights: Redland Place (the cul-de-sac to the south and east of Plaintiffs' Properties, which contains lots 7-16 of El Cerrito Heights); or the four-foot undefined easement to the south of Plaintiffs' Properties (which encircles all of El Cerrito Heights at the edge of its border). We disagree.

In support of the City's motion for summary judgment, the City's expert testified that the brow ditch does not drain water from public areas:

> "The concrete brow ditch accepts only runoff and surface water landing on the hillside during rain events or from the *private properties* to the south and uphill from Plaintiffs' properties. No City drainage facility is located upstream of the brow ditch."[17] (Italics added.)

In our de novo review, we conclude that, by the foregoing evidence, the City met its initial burden for summary judgment purposes.

On appeal, Plaintiffs argue that the City's expert's testimony "does not negate the possibility of overflow from the storm water drainage system finding its way into the brow ditch."[18] In support of their position, Plaintiffs rely on the following explanation from their expert to the effect there is a "*potential*" that water from Redland Place (a public street above and to the

---

[17] Once again, Plaintiffs' expert did not disagree with this statement, expressly testifying that the City's expert was "accurate in his descriptions."

[18] In the same sentence, Plaintiffs argue that the City's expert's testimony "apparently refers only to a formal connection to the City's storm water drainage system." However, there is nothing in the expert's declaration that limits his statement to "a formal connection" to the drainage system, and Plaintiffs do not provide a record reference for their assertion.

south of the brow ditch) ran down the private property lots to the north of Redland Place and into the brow ditch (italics added):

> "These lots [in El Cerrito Heights] drain to the north [downhill toward College Valley].  And *it could be* that water goes down their driveways or down their side yards that comes off the street, and it doesn't make its way to the storm drain."  (Italics added.)

Again, however, Plaintiffs' expert's testimony is speculative.  Not only did the expert acknowledge that there was merely the *potential* for water from Redland Place to run through the private property lots and into the brow ditch, in response to a direct question at his deposition, he stated that, despite the opinion quoted above regarding *potential* runoff from Redland Place, he "ha[s] not observed any of that."

Since "speculative matters are not a proper basis for an expert's opinion" (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 801, p. 25) and "[e]xpert testimony must not be speculative" (*Sargon*, *supra*, 55 Cal.4th at p. 769), in our de novo review we do not consider the evidence on which Plaintiffs rely regarding runoff from Redland Place in El Cerrito Heights.

Plaintiffs criticize the City's presentation on the basis that the City's expert "did not comment on Plaintiffs' contention that water which fell on the City's four-foot easement, which was directly above the brow ditch, would be entering the city storm water system via the brow ditch."  To the extent the foregoing criticism presents an issue on appeal, Plaintiffs have forfeited review of it.  That is because appellate parties are required to "support each point by argument and, if possible, by citation of authority" (Cal. Rules of Court, rule 8.204(a)(1)(B)); and the failure to comply with this requirement results in a forfeiture of appellate review of the issue (*Trinity Risk*

*Management*, *supra*, 59 Cal.App.5th at p. 1008; *Delta Stewardship*, *supra*, 48 Cal.App.5th at p. 1075).

For the foregoing reasons, Plaintiffs did not meet their responsive burden of presenting evidence that establishes a triable issue of material fact as to whether the brow ditch served a public purpose.

2.  *Approval or Acceptance of the Brow Ditch*

We now consider whether, by its actions, the City expressly or impliedly accepted or approved the brow ditch as a public improvement.

The City presented evidence and legal authorities in support of its position that there was not sufficient evidence of any " 'official acts of dominion and control' " over the brow ditch to transform the private property to a public improvement.  On appeal, Plaintiffs disagree, arguing that, either explicitly or implicitly, the City accepted or approved the brow ditch as a public improvement when, as described by Plaintiffs, (1) the City repaired the brow ditch in 1996, and/or (2) the City provided maintenance for the brow ditch in the 1980's.[19]

We begin with the understanding that a public entity is not liable for inverse condemnation damages when the public improvement at issue is constructed entirely by private parties and is not dedicated or accepted for dedication by the public entity.  (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336-337.)  An essential element for a claim of inverse condemnation arising out of damage from a public improvement is a showing

---

[19]  Plaintiffs do not tell us whether, by their disagreement, they contend the City did not meet its initial burden or they adequately met their responsive burden.  They argue only that, because each of those two events raise triable issues of fact, the trial court erred and the judgment should be reversed.

that the public entity built, accepted, approved, or maintained the improvement that caused the damage to the plaintiff's property. (*Ruiz*, *supra*, 47 Cal.App.5th at pp. 516-519 [collecting cases].)

*Ruiz* involved an inverse condemnation claim by homeowners who argued that their property was damaged by the discharge of water that was collected as part of the public entity's drainage system and delivered by the public drainage system through a privately-owned drainage pipe which failed, causing the damage. (*Ruiz, supra*, 47 Cal.App.5th at pp. 509-511, 513.) The property owners contended that the pipe had become " 'a public work as part of an integrated [county] system.' " (*Id.* at p. 513.) We disagreed, ruling in relevant part that, regardless how many years the public entity had been running its drainage through the privately-owned pipe, there was no implied acceptance of the private pipe into the public drainage system, because there was no evidence that the public entity did anything to "demonstrat[e] dominion or control of the [private] pipe." (*Id.* at p. 518.) Absent a showing of the public entity's planning, construction, maintenance, inspection, or repair of the private pipe, the public entity's "use" of the pipe did not allow for a finding of implied acceptance by the public entity. (*Ibid.*)

Plaintiffs rely on *Tischauser v. City of Newport Beach* (1964) 225 Cal.App.2d 138 (*Tischauser*). In *Tischauser*, the issue was whether, for purposes of impliedly accepting the dedication of a street from the developer, the public entity's actions demonstrated sufficient dominion and control over the property at issue. (*Id.* at p. 145.) There, the public entity: adopted multiple resolutions and ordinances regarding the street and related area; changed the name of the street; issued permits allowing the construction of piers and concrete bulkheads on the street; maintained trash containers along the street; established a lifeguard station near the disputed area; and

both built a sidewalk and installed street lights along a portion of the street. (*Id.* at pp. 141-142.) Given these undisputed facts, we had little difficulty concluding, as a matter of law, that the public entity had demonstrated sufficiently "official act[s] of dominion over the property" to support an implied acceptance of the dedication. (*Id.* at p. 145.)

In response, the City relies principally on *Locklin*, *supra*, 7 Cal.4th 327, which, in part, involved a claim of inverse condemnation by the downstream property owners along a privately-owned creek, after upstream development by the public entity (e.g., paved streets and other public areas) increased the volume and velocity of water flowing into the creek. (*Id.* at pp. 338-339.) As relevant here, the property owners argued that the public entity had expressly or impliedly accepted the creek as a public improvement based on "evidence that on occasion [the public entity] . . . remov[ed] fallen trees from the creekbed." (*Id.* at p. 370.) As a matter of law, our Supreme Court concluded that such evidence did not establish official acts of sufficient dominion or control over the private creek to transform it into a public work or improvement. (*Ibid.*) In particular, the court based its ruling on evidence that the public entity provided the maintenance only after receiving the property owners' permission. (*Ibid.*)

We now apply the concept of "official acts of dominion and control" to the two incidents on which Plaintiffs rely. As we explain, neither raises a triable issue of material fact as to whether the City accepted or approved the privately-owned brow ditch for purposes of transforming it into a public improvement.

a.     *The City's 1996 Repair of the Brow Ditch*

Plaintiffs suggest that, when the City contracted to repair the section of the brow ditch in the Coffman Property that was damaged in 1996, the City

23

exerted official dominion and control sufficient to establish a triable issue of material fact as to whether the City accepted or approved the brow ditch as a public improvement. In 1996, after the City's public sewer main failed, causing damage to the brow ditch, the City hired a contractor to repair the brow ditch it had damaged. Even though the contractor, based on the City's design and direction, replaced a straight section of the damaged brow ditch with a curved section, as we explain, the 1996 repairs do not establish dominion and control for purposes of an implied acceptance or approval of the brow ditch as a public improvement.

At the time of this repair to the brow ditch, as expressly acknowledged by the owners of the Coffman Property (plaintiff Coffman and her husband), the City was acting in response to the need for "emergency repairs or services to the [brow ditch]" which was caused by a "breakage" in the City's sewer main. (Capitalization omitted.) Before commencing any work on the brow ditch, the City obtained the written authorization from the owners of the Coffman Property to proceed with the following "services": (1) "Emergency clean[-]up of damage from sewer main breakage"; (2) "Repair of drainage swale [i.e., the brow ditch] per drawings prepared by Group Delta Consultants dated July 18, 1996"; and (3) "Restoration of site to pre[-]loss condition due to damage from [sewer] main break and swale repairs." (Some capitalization omitted.) The authorization expressly disclosed that the approved "services" would be provided by the City, at its expense, to "*property . . . owned or occupied*" by Coffman and her husband and were "necessary to remedy the emergency situation" *caused by the failure of the City's sewer main*. (Italics added.)

Thus, this case is vastly different from *Tischauser*, *supra*, 225 Cal.App.2d 138, on which Plaintiffs rely. In *Tischauser*, the defendant city

24

had taken a number of affirmative actions which evidenced dominion and control of the street in Newport Beach over a period of time during planned non-emergency situations. (*Id.* at pp. 141-142.)

This case is also distinguishable from *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, disapproved on other grounds in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, on which Plaintiffs also rely. In *Marin*, the plaintiff homeowners sued a public entity for inverse condemnation after the failure of an underground storm drain pipe, which the prior owners had installed in a natural watercourse under the home. (*Id.* at pp. 593-594.) In addition to directing and supervising all aspects of the installation of the privately-owned pipe, the public entity knowingly used the pipe for years as part of the public storm drainage system. (*Id.* at p. 596.) By contrast, here, the City performed one repair of damage *it caused* to the private property—property that had nothing to do with the provision of public services—after requesting and receiving the express approval of the owners of the private property.[20]

Like the occasional maintenance of the creekbed in *Locklin*—i.e., with the permission of the property owners—the one-time emergency repair of the brow ditch with the permission of the property owners here does not support an inference that the City was exercising dominion or control of the brow ditch. (See *Locklin*, *supra*, 7 Cal.4th at p. 370.)

---

[20] To the extent Plaintiffs contend that the emergency services performed at the direction of the City in 1996 were below the standard of care (or otherwise support a claim against the City or its contractor based on the design or installation of the repairs), we express no opinion. All that is before us is Plaintiffs' claim for inverse condemnation.

b. *The City's Maintenance of the Brow Ditch in the 1980's*

Plaintiffs next suggest that the following evidence establishes a triable issue of fact as to whether the City implicitly accepted or approved the brow ditch: Once a year, on four or five occasions from 1981 through 1987, two to three City workers cleaned out surface debris in that part of the brow ditch that traverses the few lots on the south side of Maisel Way.

In relying on this evidence, however, Plaintiffs fail to explain how these occasional cleanings can be considered, as required by California law, *official acts* of dominion and control. (*Ruiz, supra*, 47 Cal.App.5th at p. 517; *Ullery, supra*, 202 Cal.App.3d at p. 568; *Yox, supra*, 182 Cal.App.3d at p. 354; *Tischauser, supra*, 225 Cal.App.2d at p. 145.) From the evidence presented, we know only that, in 2019, one of Plaintiffs' neighbors remembered that, during the 1981-1987 time period, he saw two or three "City workers" walking through the brow ditch, cleaning out surface debris.[21] As a matter of law, such evidence does not establish the requisite dominion and control sufficient to raise an inference of an implied acceptance of the brow ditch. (*Locklin, supra*, 7 Cal.4th at p. 370 [with regard to the drainage easement at issue, "[t]he evidence that on occasion [the public entity] assisted residents by removing fallen trees from the creekbed, on request of the owners and with permission to cross their property in doing so, would not support an inference that [the public entity] was exercising control over the watercourse"].)

Even if we were to assume without deciding that these irregular visits established dominion and control, Plaintiffs have presented no evidence (or inferences from evidence) that these visits were *official acts* of the City, as

---

[21]    This is despite the fact that there is no legal access for City workers to reach the brow ditch.

required to support a finding of implied approval or acceptance of the brow ditch as a public improvement. Plaintiffs present no authority, and our independent research has disclosed none, that supports Plaintiffs' proposition that the cleaning of private property by a City employee implies that the City authorized a transformation of private property to a public improvement.

Plaintiffs cite to *Union Transportation Co. v. Sacramento County* (1954) 42 Cal.2d 235 for their statement that "simply dispatching equipment for the repairs may be enough to demonstrate acceptance and control." In *Union Transportation Co.*, the Supreme Court held that the affirmative action by *a county supervisor of roads* in dispatching road equipment with instructions that the operator of the equipment repair the private road (that contained a bridge which later collapsed) supported an inference that the county had impliedly accepted a dedication of the road for purposes of determining whether the county had exercised dominion and control over the road. (*Id.* at p. 244.) In relying on *Union Transportation Co.*, Plaintiffs ignore the Supreme Court's reliance on the requirement "that there be some *official action* consistent with an acceptance of" the private property in order to support an inference the public entity "impliedly had accepted" the property. (*Ibid.*, italics added.) Even though "no formal act of acceptance is necessary" for a public entity to assume control over the private property, there must be a showing of "action of the *responsible public officials* showing an assumption of control[.]" (*Ibid.*, italics added.) Whereas a county supervisor of roads directed the dispatch of equipment for the repairs in *Union Transportation Co.* (*ibid.*), here Plaintiffs have not attempted to make this type of required showing with regard to the four or five surface cleanings of the brow ditch over a seven year period more than 30 years ago by two to three City employees.

## IV.  DISPOSITION

The judgment is affirmed.  The City is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

IRION, J.

WE CONCUR:

BENKE, Acting P. J.

GUERRERO, J.