Filed 3/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRIAN SHENSON et al., | A164045 |
| Plaintiffs and Appellants, | |
| v. | (Contra Costa County |
| COUNTY OF CONTRA COSTA et al., | Super. Ct. No. CIVMSC1701267) |
| Defendants and Respondents. | |

Plaintiffs and appellants (collectively, Owners) are two couples who purchased residential properties in neighboring subdivisions within Contra Costa County (County) in 2010 and 2016. Both properties are adjacent to a creek. They sued the County and a flood control district (collectively, Government Entities) for inverse condemnation and parallel tort causes of action after drainage improvements the subdivision developers had constructed 40-plus years earlier failed and serious erosion and subsidence damaged Owners' properties. Owners appeal from the judgment the superior court entered after granting summary judgment against them on their complaint.

The parties litigated the case for about four years, completing all or most discovery. The Government Entities filed motions for summary judgment or in the alternative summary adjudication. The material facts are undisputed. In substance, in the mid-1970s, the County approved

1

subdivision maps for two subdivisions containing the parcels later acquired by Owners.  The creek that runs along Owners' properties is a natural watercourse that functions as the main receptacle for storm runoff emanating from the watershed above Owners' properties and is the only reasonable means of collecting and conveying that runoff.  Pursuant to the Subdivision Map Act, the County required the developers to make certain drainage improvements to collect and convey water from the two subject subdivisions as well as one adjacent subdivision, to the creek.  Among the properties that contribute runoff to the creek by way of the improvements were three roads, two private roads serving as ingress and egress to the subdivisions and one county owned road that is adjacent to one of the subdivisions.

As provided by the Subdivision Map Act, the County also required the subdivision developers to dedicate drainage easements to the County.  When it approved the subdivision maps, however, the County did not accept the offers of dedication for the drainage improvements, which remained in the ownership of the developers and later the homeowners who purchased the property.

Owners claim the County assumed ownership and responsibility for the drainage improvements by requiring the subdivision developers to construct them and to offer to dedicate easements to the County to enable it to maintain them.  The County contends that it did not accept the offers to dedicate the easements and did not otherwise assume responsibility for maintaining them.

Owners sued the flood control district under inverse condemnation and other theories, positing that its collection of drainage fees from homeowners in subdivisions within the watershed rendered it responsible for the drainage improvements constructed by the subdivision developers.  The evidence

indicates the district did not fund those improvements, which preceded its formation. It contends it cannot be liable for merely collecting fees for future improvements that, thus far, have not been constructed because of the unavailability of matching federal funds.

We affirm the judgment. As a matter of law, a public entity must either own or exercise actual control over a waterway or drainage improvements to render them public works for which the public entity is responsible. The undisputed facts here do not establish any such ownership or control.

## BACKGROUND

### I.

### *Facts*

In the 1970s and 1980s, the County approved subdivision maps for minor subdivisions in then-unincorporated parts of the County. As relevant here, the County approved the developer's application for a subdivision map for Minor Subdivision (MS) 102-72 in 1973, subject to various conditions. It approved the application for Subdivision 4983 in 1980, again apparently subject to conditions.

Both subdivisions were bordered on one side by a tributary of a creek known as "Murderer's Creek." As the parties have done, for ease of reference we will refer to the tributary as "Murderer's Creek" or "the Creek." The Creek is a natural watercourse that has functioned historically as the main receptacle for storm water runoff emanating from the watershed upstream of these subdivisions. When the applications for the subdivision maps for subdivisions MS 102-72 and 4983 were made, the County imposed certain conditions relating to drainage.

3

One condition for approval of the MS 102-72 subdivision map was that the subdivision developer "construct, install and complete . . . tract drainage" and conduct related work and improvements "in a good, workmanlike manner. In accordance with accepted construction practices and in a manner equal or superior to the requirements of the County Ordinance Code and rulings made thereunder . . . ." The developer was required by county ordinance to collect and convey "[a]ll surface waters flowing from the subdivision in any form or manner" from the development to the nearest natural watercourse with a definable bed and banks or to a public storm drainage facility. The developer of MS 102-72 was required, among other things, to improve the channel of the Creek "to convey the peak design runoff for the watershed" and to provide drainage of runoff from a private cul-de-sac within the subdivision known as "Kelly Ann Court" via a conduit to the Creek.

Some of the other drainage improvements the developer constructed and installed were an outfall at the Creek with a spillway to protect the bed and bank of the Creek against erosion from the accelerated discharge of surface water from the pipeline into the Creek, sidewalks, curbs, and gutters on Gloria Terrace, a County road adjacent to the subdivision, and a means of diverting and conveying surface water accumulating on that road through MS 102-72 to the discharge point at the Creek. At some point during the subdivision process, the County requested the developer's cooperation in obtaining an easement within MS 102-72 for the purpose of installing a drain line to complete public improvements benefiting a neighboring subdivision (Subdivision 4234). MS 102-72 improvement plans submitted to the County included the "buried storm drain line" running along the western limit of the subdivision where it adjoined Subdivision 4234, which received runoff from

4

that subdivision, merged with runoff from MS 102-72 in a catch basin and was conveyed through an underground pipeline through MS 102-72 to the Creek.

The developers of MS 102-72 (and Subdivision 4234) designed and constructed the improvements, not the County. However, a county ordinance required developers to submit plans for required improvements to the County's Public Works Department for review and required the Department to inspect the work and, when satisfied it was complete and met county requirements, to recommend that the County Board of Supervisors accept the improvements. The limited purpose of such acceptance was to establish an end date for the contractor's liability under a provision requiring it to guarantee performance of the work and repair of defects for a one-year period after acceptance.

The Board by resolution accepted the improvements for MS 102-72 as "completed for the purpose of establishing a terminal period for filing liens in case of action under [the MS 102-72] Subdivision Agreement" in 1978. As also required by ordinance, the Board adopted a resolution at the end of the one-year period finding "the improvements have satisfactorily met the guaranteed performance standards for one year after completion and acceptance."

The developer was required to obtain or dedicate drainage easements to the County for certain drainage improvements. The parcel map for MS 102-72 depicts two drainage easements and a note indicating they are "dedicated to Contra Costa County for drainage purposes." The actual drainage easement dedication language is contained in a separate document entitled "Offer of Dedication" that was recorded in 1975. It provided that the developer "being the present title owner(s) of record of the herein described

5

parcel of land, do hereby make an irrevocable offer of dedication to Contra Costa County and its successor or assign, of an easement for storm, flood and surface water drainage, including construction, access, or maintenance of works, improvements and structures, . . . or the clearing of obstructions and vegetation, upon the real property . . . described as follows . . . ." The document refers to the parcel map for the location of the easements. It further states, "It is understood and agreed that CONTRA COSTA COUNTY and its successor or assign shall incur no liability with respect to such offer or dedication, and shall not assume any responsibility for the offered parcel of land or any improvements thereon or therein, until such offer has been accepted by appropriate action of the Board of Supervisors, or of the local governing body of its successor or assign." In December 1975, the County issued and recorded an order stating that the offer was "ACCEPTED *for recording only*." (Italics added.)[1]

The subdivision process for Subdivision 4983 took place a few years after MS 102-72 was completed. The County required the developer of this subdivision to make drainage improvements as well. The improvements appear to have been more modest and included an asbestos cement pipe coupled to a corrugated steel pipe storm drain to collect storm water runoff from Via Ferrari, a small private street within the subdivision, and carry it to an outlet at the Creek. The County did not design, construct or install the drainage improvements on Subdivision 4983. It did inspect the drainage plans and the improvements as required by local ordinance.

---

[1] Six months later, it rescinded that order because of an error in the subdivision number and issued and recorded a corrected order, again providing that the acceptance of the offer was "for recording only."

6

On the subdivision map, the developer offered to dedicate two drainage easements to the County. The County expressly did not accept or reject the offer to dedicate the easements.

There is no record of the County ever expressly accepting the offers of the subdivision developers for either MS 102-72 or Subdivision 4983 to dedicate drainage easements. There is no record of the County indicating it has ever performed maintenance or repair of the drainage improvements constructed on MS 102-72 or Subdivision 4983. Nor are there any County records indicating the County performed maintenance of or repairs to Murderer's Creek at or upstream of the subdivisions.

Owners purchased properties in the subdivisions three to four decades after the subdivision maps were approved. In 2011, Brian Shenson and Emily Shenson purchased real property at 1904 Via Ferrari in Subdivision 4983 (the Shenson Property). The Creek flows along the Shenson Property's northeasterly property line. In 2016, Megan Frantz and David Mariampolski purchased property near the Shenson Property at 18 Kelly Ann Court in MS 102-72 (the Frantz Property). The Creek flows along or near the Frantz Property's southwesterly property line.[2]

In early 2016, the spillway the developer had constructed four decades earlier failed and collapsed into the Creek bed. The uncontrolled discharge of water into the Creek caused a scour hole to form and expand, eventually onto the neighboring private subdivisions. Owners allege the scour hole caused

---

[2] Owners contend that a portion of MS 102-72 that includes part of the Creek where it adjoins the lot that later became the Frantz Property was deeded to the Pleasant Hill Park District and became part of Brookwood Park. The Park District is not a party to this appeal. Whether some of the improvements are on the Frantz Property or the Park District's property is not material to this appeal.

erosion and subsidence damage to their respective properties. Owners contend the Government Entities are responsible for the formation of the scour hole because they failed to maintain the Creek's bed and banks and refused to repair or replace the spillway after it failed. In 2017–2018, the expanding scour hole contributed to the failure of a second spillway that was located 20 feet north of the first spillway and had served the water discharge needs of Subdivision 4983.

## II.

### *Complaint and Motion for Summary Judgment*

The operative third amended complaint alleged causes of action for inverse condemnation, trespass, nuisance and dangerous condition of public property.[3] Owners alleged the County was responsible for the damage the Creek and drainage improvements caused to their properties for several reasons. First, the County approved subdivision MS 102-72; second, it required the developer of that subdivision to construct the drainage improvements, including a pipeline, a spillway and a catch basin; third, it used those facilities to discharge water from another subdivision and from city streets into the Creek; fourth, it required the developer to offer to dedicate to the County an easement over the property containing those improvements and portions of the bed and banks of the Creek; and fifth, it permitted and encouraged private development of properties upslope from Owners' properties. Owners further alleged that the County accepted the drainage improvements from the developer, used them for public purposes, approved subdivision maps depicting the drainage easements and now "owns

---

[3] The pleading also included claims against the Pleasant Hill Park District. The claims against the Park District are not the subject of this appeal.

8

and controls" the land within the drainage easements. They alleged that the County "approved, owned, operated, controlled, repaired and/or maintained a public drainage system" of which the Creek is a part and that the drainage system caused damage to Owners' properties.

Owners alleged that the Contra Costa County Flood Control and Water Conservation District (District) incorporated the Creek into the public drainage system through its establishment of a statutory drainage area known as Drainage Area 46 that includes the Creek, Owners' properties and other properties in the area. They alleged the County and District assessed and continue to assess "storm drainage fees" from property owners within Drainage Area 46 to offset the increased burden that new and expanding development in the area has put on the public drainage system. They further alleged that the District chose to hold the funds from the collected drainage fees to be used for a future project instead of using them to install mitigation measures against the increased water runoff or to repair the spillway.

The County and the District filed motions for summary judgment or summary adjudication. The County argued it was not liable to Owners for inverse condemnation because (1) the Creek was not a public improvement owned or controlled by the County; (2) its acts in approving the subdivisions and requiring drainage improvements and offers of dedication did not transform the Creek into a public storm drain system or otherwise make it or the improvements a public work; (3) it had not accepted the offers of dedication of drainage easements after they were made; and (4) it had not made repairs or maintained the improvements or otherwise impliedly accepted the offers. Finally, the County argued that Owners' related tort causes of action for nuisance, dangerous condition of public property, and

9

trespass also fail since neither the Creek nor the drainage improvements were public improvements owned or controlled by the County.

The District made similar arguments. The District explained that it was formed in 1951 and was statutorily authorized to establish "drainage areas" and to "institute drainage plans for the specific benefit of such areas." It argued that none of its activities, including forming Drainage Area 46 "with the goal of implementing a regional concept-plan for flood protection to protect areas in the City of Pleasant Hill downstream of Taylor Blvd.," adopting a Drainage Fee Ordinance, establishing a drainage facilities fund for that project, and requesting (but not receiving) matching federal funds, transformed the Creek into a District-owned or controlled public improvement. Further, it argued that it was not an offeree and did not accept the offers of dedication by the subdivision developers, did not provide any storm drainage services, is not a landowner in the watershed, does not divert flows from outside areas into the watershed, does not own any upstream properties or discharge any runoff into the creek, and did not use or otherwise impliedly accept the easements.

In opposition to the County's motion, Owners contended the County was liable for inverse condemnation because it (1) required the developer of MS 102-72 to install drainage improvements as a condition of approval so that surface water from Gloria Terrace (a County road) and a neighboring subdivision could be conveyed through MS 102-72 and into the Creek; (2) required the developer to place drainage easements over these improvements and dedicate them to the County; and (3) jointly with the District, exercised dominion and control over the Creek by requiring all property owners within Drainage Area 46 to discharge additional runoff caused by improvements to their properties into the Creek.

10

Owners opposed the District's motion on grounds similar to those in its opposition to the County's motion. Owners additionally argued that the District incorporated the Creek into the public drainage system by (1) creating Drainage Area 46; (2) compelling property owners who develop land in the watershed to use the Creek to dispose of additional storm drainage; and (3) collecting storm drainage fees from property owners for this use.

As part of their oppositions, Owners submitted the declaration of Douglas Flett, a civil engineer. As relevant to this appeal, the declaration stated that if the County had intended the drainage improvements in MS 102-72 to be private instead of public, it would not have required the property owner to dedicate the drainage easements to the County for public use. Further, if the County had intended for the owner to maintain the improvements, the easements would have been conveyed to a homeowners' association. The expert concluded that this was "evidence that at the time of the creation of [MS 102-72], the parties understood that the County would have the maintenance obligation for the drainage system that serves the subdivision." The County and the District objected to this testimony on the bases of lack of foundation (Evid. Code, § 403), improper expert opinion (*id.,* § 801), and speculation (*id.,* § 801, subd. (b)).

The trial court granted summary judgment in favor of the County and the District, concluding there was insufficient evidence to support the assertion that they exerted control over or assumed responsibility for either the Creek or the drainage system and that the County's use of the Creek to drain surface water from county roads and to require other riparian owners in the watershed to do the same did not transform the Creek into a public drainage system. The court held that under our Supreme Court's decision in *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327 (*Locklin*), requiring the

11

dedication of drainage easements as a condition precedent to subdivision approval "does not demonstrate [defendants'] control over a natural watercourse." The undisputed evidence established that the County did not accept the drainage easements on the Shenson Property and accepted the easements on the Frantz Property for recording purposes only. The trial court sustained the County's objection to a portion of Flett's declaration.

Nor, the court held, were the District's acts in collecting fees from property owners evidence of control of the Creek or storm drain facilities. The fees collected were "in service of a proposed plan that has not been implemented." There was no evidence that the District provided storm drainage services or maintained any of the easements and the court concluded the evidence failed to show control by the District.

The court entered judgment in favor of the County and the District, and Owners timely appealed.

## DISCUSSION

## I.

### *Standard of Review*

Summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant seeking summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A defendant meets this burden by showing that plaintiff "has not established, and cannot reasonably expect to establish" an essential element of his claim. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

12

We review a grant of summary judgment de novo, which means we "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) In deciding whether a material issue of fact exists for trial, we "consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence." (Code Civ. Proc., § 437c, subd. (c).) We view the evidence in the light most favorable to the plaintiffs, as the nonmoving parties, liberally construing their evidentiary submission while strictly construing the defendants' own showing and resolving any evidentiary doubts or ambiguities in plaintiffs' favor. (*Saelzler v. Advanced Group 400, supra*, 25 Cal.4th at p. 768.)

## II.

### *Substantive Law*

#### A. The Subdivision Map Act

"The Subdivision Map Act is 'the primary regulatory control' governing the subdivision of real property in California. [Citation.] The Act vests the '[r]egulation and control of the design and improvement of subdivisions' in the legislative bodies of local agencies, which must promulgate ordinances on the subject. ([Gov. Code,] § 66411.) The Act generally requires all subdividers of property to design their subdivisions in conformity with applicable general and specific plans and to comply with all of the conditions of applicable local ordinances." (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996-997 (*Gardner*), fn. omitted.)

"Ordinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map pursuant to [Government Code] section 66426, when five or more parcels are

13

involved, or a parcel map pursuant to [Government Code] section 66428 when four or fewer parcels are involved. [Citation.] A local agency will approve a tentative and final map or a parcel map only after extensive review of the proposed subdivision and consideration of such matters as the property's suitability for development, the adequacy of roads, sewer, drainage, and other services, the preservation of agricultural lands and sensitive natural resources, and dedication issues. (See, e.g., [Gov. Code,] §§ 66451–66451.7, 66452–66452.13, 66453–66472.1, 66473–66474.10, 66475–66478.)" (*Gardner*, *supra*, 29 Cal.4th at p. 997.)

"By generally requiring local review and approval of all proposed subdivisions, the Act aims to 'control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general.' [Citation.] More specifically, the Act seeks 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' " (*Gardner*, *supra*, 29 Cal.4th at pp. 997-998.)

The Act defines "[d]esign" to include, among other things, "drainage and sanitary facilities and utilities, including alignments and grades thereof." (Gov. Code, § 66418.[4]) It defines "[i]mprovement" to include "any street work and utilities to be installed, or agreed to be installed, by the subdivider on the land . . . as are necessary for the general use of the lot owners in the subdivision and local neighborhood traffic and drainage needs as a condition precedent to the approval and acceptance of the final map thereof." (§ 66419, subd. (a).) It has been said that "[o]ne of the main purposes of the

---

[4] All further statutory references are to the Government Code unless otherwise specified.

Subdivision Map Act is to require the subdivider to install properly the streets and drains under the provisions of that act." (*City of Buena Park v. Boyar* (1960) 186 Cal.App.2d 61, 67.)

The Act provides "the key authorization for imposing conditions on development." (4 Manaster & Selmi, Cal. Environmental Law and Land Use (2022) Subdivision Regulation (4 Manaster & Selmi) § 61.03[6] at pp. 61-28 to 61-28.1 (rels. 51-10/2009, 60-3/2014).) "In approving subdivisions, local agencies require that land be dedicated for public uses, that public and private improvements be built, that design review fees be paid to cover the cost of design review, and that capital or impact fees be paid to cover the subdivided land's share of the costs for a wide range of amenities." (*Id.*, § 61.06[1] at p. 61-74.2 (rel. 76-4/2022).)

The Act contains "provisions authorizing local agencies to impose specific conditions on subdivision approvals to achieve certain public purposes or offset particular impacts." (4 Manaster & Selmi, *supra,* § 61.06[2] at pp. 61-74.2 to 61-74.3 (rel. 76-4/2022); see *Youngblood v. Board of Supervisors* (1978) 22 Cal.3d 644, 652 ["The Subdivision Map Act contemplates that the local agency, when it approves a tentative map, will normally attach conditions to that approval, such as the completion of planned subdivision improvements, and will approve the final map only after certifying that the subdivider has complied with those specified conditions"].) This includes improvements for such things as streets, utilities and drainage. (4 Manaster & Selmi, *supra,* § 61.03[6] at pp. 61-28 to 61-28.1 (rels. 51-10/2009, 60-3/2014).) Indeed, requiring the subdivider to install drainage has been described as one of "several salutary purposes" of the Act. (*Pratt v. Adams* (1964) 229 Cal.App.2d 602, 605-606.) It is typical for a subdivision agreement to require a subdivider to perform the work constructing

15

improvements in accordance with plans and specifications previously approved by the local agency and to require security to ensure performance of the work. (4 Manaster & Selmi, *supra,* § 61.04[9][b][ii] at pp. 61-58 to 61-59 (rel. 38-3/03).) Another common condition is that the subdivider dedicate or make an irrevocable offer of dedication for such purposes such as streets, drainage, public utilities or public access. (See § 66475.)

## B.    Inverse Condemnation

The primary theory asserted by Owners is based on the law of inverse condemnation. To understand the parties' allegations and arguments and the issues in the summary judgment proceedings at the heart of this appeal, some background about tort and inverse condemnation law as it pertains to subdivisions and drainage is required.

A public entity may be liable as a property owner when alterations or improvements to its own upstream property result in the discharge of an increased volume of or velocity of surface water in a natural watercourse causing damage to the property of a downstream owner. (*Locklin*, *supra*, 7 Cal.4th at p. 337.) As with any upstream property owner, whether public or private, a government entity is only liable if, considering all of the circumstances, its conduct was unreasonable and the lower property owner acted reasonably. (*Ibid.*) Damage resulting from improvements on publicly owned property may also result in inverse condemnation liability. (*Id.* at pp. 337-338.)

Further, a government entity may be liable in inverse condemnation where the increased volume or velocity of surface waters and resulting damage are caused by discharge of increased surface waters from public works or improvements on publicly owned land or if it has incorporated the watercourse or public improvements into a public drainage system. (*Locklin,*

16

*supra*, 7 Cal.4th at pp. 337-338.)  The theory underlying inverse condemnation liability in these contexts is similar to that for inverse condemnation generally:  the downstream owner "may not be compelled to accept a disproportionate share of the burden of improvements undertaken for the benefit of the public at large."  (*Id*. at p. 338; see also *id*. at p. 367; *Belair v. Riverside County Flood Control Dist*. (1988) 47 Cal.3d 550, 558 [decisive consideration is whether owner of damaged property if uncompensated would contribute more than his proper share to public undertaking].)  Similar to a tort, under inverse condemnation, the reasonableness of the public entity's conduct matters.  The public entity will be liable only "if it fails to use reasonably available, less injurious alternatives."  (*Locklin, supra*, at p. 338.)  In addition, the downstream owner must take reasonable measures to protect his property and if he fails to do so, there is no liability.  (*Ibid*.)

"A storm drainage system constructed and maintained by a public entity" is a public work.  (*Souza v. Silver Development Co.* (1985) 164 Cal.App.3d 165, 170.)  To convert an existing watercourse into a public work, "[a] governmental entity must exert control over and assume responsibility for maintenance of the watercourse if it is to be liable for damage caused by the streamflow on a theory that the watercourse has become a public work."  (*Locklin, supra*, 7 Cal.4th at p. 370.)  The same is true of converting privately constructed improvements into public works. (*Ullery v. County of Contra Costa* (1988) 202 Cal.App.3d 562, 570 (*Ullery*).) "Official acts of dominion and control constituting acceptance of the private drainage system can be shown if the public entity does maintenance and repair work.  [Citations.]  Use of land for a public purpose over time may constitute implied acceptance of the offer of dedication.  [Citation.]  On the

17

other hand, where 'there is no acceptance of a street or the drainage system within it, there is no public improvement, public work or public use and therefore there can be no public liability for inverse condemnation.' " (*Id.* at pp. 568-569.)

"[I]nverse condemnation liability will not lie for damage to private property allegedly caused by private development approved or authorized by the public entity, 'where the [public entity's] sole affirmative action was the issuance of permits and approval of the subdivision map.' " (*Ullery, supra,* 202 Cal.App.3d at p. 570.)

## III.

### *Plaintiffs' Theories on Appeal*

Owners assert three theories to support their claims of inverse condemnation, one as to the County only and two as to the County and the District jointly.

As to the County alone, Owners claim the MS 102-72 spillway was a component of a drainage system that must be considered public. This is so, they argue, because (1) the County required the subdivider to construct it as a condition of approval of the subdivision; (2) it serves two off-subdivision needs and provides no benefit to the subdivision itself; and (3) the drainage system does not follow any "natural" drainage path but instead collects and conveys water that would never enter the subdivision if not for the system. This evidence, they contend, raises a triable issue whether the drainage system is a public use under inverse condemnation standards.

As to the County and the District jointly, Owners claim there is a triable issue whether defendants "have incorporated Murderer's Creek into the public drainage system through their joint management, and evident mismanagement, of Drainage Area 46." Owners also claim that even if

18

defendants' "joint management of and control over the Murderer's Creek watershed did not incorporate the Creek into the public drainage system," they are liable "if their management of Drainage Area 46 places a disproportionate and therefore 'unreasonable' burden on downstream riparian property owners." They contend the trial court erred by failing to apply the six "*Locklin* factors" required to analyze this issue.

**IV.**

***Plaintiffs' Claims Fail As a Matter of Law.***

Whether an improvement or waterway is a public use or public work for purposes of inverse condemnation liability is a question of law when factual issues are not in dispute. (See *Locklin, supra*, 7 Cal.4th at pp. 369-370.)

### A. Plaintiffs Have Not Raised a Triable Issue Whether the Spillway Is a Public Improvement or Use and Given the Undisputed Facts It Is Not a Public Work As a Matter of Law.

*Locklin* established that "a governmental entity may be liable under the principles of inverse condemnation for downstream damage caused by an increased volume or velocity of surface waters discharged into a natural watercourse *from public works or improvements on publicly owned land*" "if it fails to use reasonably available, less injurious alternatives, or if it has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public work." (*Locklin, supra,* 7 Cal.4th at pp. 337-338, italics added.) Owners contend there is a triable issue of fact as to whether the MS 102-72 spillway—the failure of which they assert caused turbulence that damaged their land—was a public improvement.

The three facts Owners contend support a finding of public improvement or use are, as we have said, that the County required the

developer to construct a drainage system and place it within an easement dedicated to the County; that the spillway served the needs of two areas outside of MS 102-72 while "providing essentially no benefit to the residents of [MS 102-72]"; and that the drainage system collects water from outside its "natural" drainage path and directs it to the discharge point at the Creek.

### 1. *Requiring Construction of the Drainage System and an Offer of Dedication Did Not Convert Private Improvements into Public Works.*

There is no genuine dispute about the material facts concerning the spillway or the other drainage improvements. The County imposed on the developer a condition requiring it to "construct, install and complete . . . tract drainage," and a County ordinance required it to collect and convey "[a]ll surface waters flowing from the subdivision in any form or manner" from the development to the nearest natural watercourse with a definable bed and banks or to a public storm drainage facility. It required the developer to offer to dedicate easements for drainage purposes to the County.

The developer of MS 102-72—not the County—designed and built improvements to satisfy these requirements, including underground drainage pipelines, catch basins, and an outfall at the Creek with a "spillway feature ('Spillway') comprised of grouted and loose rock riprap lining the earthen banks of the Creek." The waters flowing through the pipelines consisted of runoff from MS 102-72, including a private road serving that subdivision known as "Kelly Ann Court"; runoff from an adjacent subdivision referred to as "Sub. 4234"; and runoff from Gloria Terrace, a county road adjacent to the subdivision. The purpose of the spillway was to protect the bed and bank of Murderer's Creek against erosion from the waters spilling into the creek from the pipeline.

20

The County required the subdivider to offer easements to the County for drainage purposes, and the subdivider did so. The County has thus far never expressly accepted the offer. There are no records of the County ever having maintained or repaired the pipeline, outlet or spillway. The County has never performed maintenance or repairs to the portion of Murderer's Creek upstream of plaintiffs' properties or installed any improvements in the creek bed or channel.

The facts Owners claim indicate the spillway is a public work are essentially undisputed.[5] And for the following reasons, we conclude as a matter of law that they do not show the County converted the Spillway into a public drainage system.

Owners' argument is somewhat difficult to follow. It begins with the proposition that " 'construction and maintenance of storm drainage systems are matters of "public policy," and such a system created by a public entity becomes a "public improvement" and a "public use." ' " Citing pre-*Locklin*

_____

[5] Owners assert, without citation, that the drainage improvements required as conditions for their subdivision "provid[e] essentially *no benefit to the residents of the Subdivision*." (Italics added.) There is no evidence to support this assertion, and the County's evidence shows the opposite is true. For example, a catch basin and the pipeline buried under the MS 102-72 collected and carried runoff from that subdivision, including the private cul de sac that serves it, to the outfall and into the creek. The spillway beneath the outfall was designed to prevent erosion of the creek bed and banks adjacent to it, which were part of the subdivision.

Owners also assert, again without citation, that the drainage "system" that the County required the subdividers to construct convey waters that would "*never enter the Subdivision . . .* were it not for the drainage system." We have reviewed the evidence proffered by Owners and find no support for this assertion. Further, we note it is undisputed that the road and subdivision that Owners describe as the "off-subdivision" areas served by these improvements, Gloria Terrace and Subdivision 4234, are immediately adjacent to MS 102-72.

21

cases for that proposition, it proceeds to contend that "[i]t does not matter whether the public entity constructed the drainage improvements itself or whether, as is more common (and happened here), the public entity required a private property owner to construct [them] through its 'approval of the subdivision maps and plans which include the drainage systems.' " The 1963 decision it quotes for that proposition, *Frustuck v. City of Fairfax*, 212 Cal.App.2d 345 (*Frustuck*), has since been rejected by this court in *Ullery*, rejecting the proposition in *Frustuck* for which plaintiffs cite it here. Division Three of this court stated, "Appellants misconstrue the law when they state that the subdivision map approval process represents a sufficient level of governmental involvement to constitute a public use or improvement subjecting the public entity to inverse condemnation liability. The cases do not stand for the proposition that approval alone creates liability in inverse condemnation." (*Ullery, supra,* 202 Cal.App.3d at p. 571.)

Further, *Frustuck* was implicitly overruled by *Locklin*. In *Locklin*, the plaintiffs alleged that the city and county had allowed development of properties upstream of plaintiffs' properties, required developers to construct roads, rights of way, culverts, storm drains and other public improvements in the watershed and required irrevocable offers of dedication of storm drainage easements on creekside properties as a condition of development permits. (*Locklin, supra,* 7 Cal.4th at pp. 340-342 & fn. 10.) *Locklin* held neither this, nor evidence that the city assisted residents in removing falling trees from the creek bed with permission from the owners and repaired an outfall above the creek, was sufficient to establish that the creek had been converted into a public work or improvement or a part of the public storm drainage system. A government entity, it opined, "*must exert control over and assume responsibility for maintenance* of the watercourse if it is to be liable for

22

damage caused by the streamflow on a theory that the watercourse has become a public work." (*Id*. at p. 370, italics added.) Without a showing that the city or other defendants exercised control over the creek, it "remain[ed] a privately owned natural watercourse." (*Id*. at pp. 370-371.)

The *Locklin* court was not moved by the assertion that the city had required drainage easements. Noting that the evidence did not establish an express or implied acceptance of the drainage easements, the court expressed doubt that "requiring and/or accepting drainage easements across private property to a privately owned natural watercourse" is even "*evidence* of control over the watercourse itself." (*Locklin*, *supra*, 7 Cal.4th at p. 370, fn. 21, italics added.)

Notably, Owners cite no current authority for the proposition that a county's imposition of conditions of approval through the Subdivision Map Act, including requirements that drainage improvements be implemented and that an offer to dedicate easements be made converts the improvements or the watercourse they affect into a public work, and we are aware of none. And *Locklin* repudiated the notion when, in rejecting an argument that the evidence in that case converted a creek into a public work, it opined, "Utilizing an existing natural watercourse for drainage of surface water runoff and requiring other riparian owners to continue to do so does not transform the watercourse into a public storm drainage system." (*Locklin*, *supra*, 7 Cal.4th at p. 370.) The latter is precisely what the County did in this case when it adopted an ordinance requiring upstream property owners of the Creek in the watershed to convey surface waters to and discharge them into the Creek. In doing so, it exercised its authority under the Subdivision Map Act to regulate the "design and improvement" of subdivisions by requiring subdivision developers to construct drainage improvements. (See

§§ 66411, 66418, 66419, 66421; 7 Miller & Starr, Cal. Real Estate (4th ed. 2022) §§ 20:1, 20:25.)

Requiring drainage-related improvements as conditions of approval of a map and offers to dedicate of easements is not an exercise of control over, or an assumption of responsibility for, maintenance of the improvement or the watercourse—especially where, as here (and in *Locklin*), there has been no acceptance of the dedication. (See *Locklin, supra,* 7 Cal.4th at p. 370 & fn. 21 [questioning whether even accepted offer of dedication would suffice].) The County also argues persuasively that *Ruiz v. County of San Diego* (2020) 47 Cal.App.5th 504 (*Ruiz*) and the cases it relies on (*Locklin, supra,* 7 Cal.4th 327, *DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329 (*DiMartino*) and *Ullery, supra,* 202 Cal.App.3d 562), likewise refute the notion that improvements constructed in connection with a subdivision over which easements are offered but not accepted by the public entity, nonetheless become public works when they are used for drainage of public or other private properties. (See *Ruiz,* at pp. 509, 515-519; *Ullery*, at p. 570 [although creek was part of system draining 40-acre watershed, absence of dominion and control by public entities supported finding of no public use].) This is so even where the public has used the improvements for drainage for decades (see *Ruiz,* at pp. 514, 516 [50 or " 'over 60' " years].)

Owners attempt to distinguish *Locklin*, claiming in that case the city had required developers "to place drainage easements over natural drainage swales across private property," whereas here the County sought "to allow future County access to the drainage improvements (curbs, gutters, two drop inlets and catch basins, two underground drainage pipelines, and the MS 102-72 Spillway that ultimately failed) that the County had required [the developer] to install to serve two off-subdivision drainage needs. These

24

drainage improvements collect and convey surface water from two off-Subdivision locations onto and across the Subdivision, into an area that this water could never reach without them."

While Owners' argument is not entirely clear, we take it to mean that by requiring offers to dedicate easements with respect to drainage improvements that served an adjacent subdivision and an adjacent street owned by the County (Gloria Terrace) and by diverting surface water to catch basins and pipelines to convey it to the Creek, the County in effect converted the improvements into public works. They cite no authority for this proposition, and we do not agree with it.

*Locklin* held that using an existing natural watercourse for drainage of surface water runoff and requiring other riparian owners to do so "does not transform the watercourse into a public storm drainage system." (*Locklin, supra,* 7 Cal.4th at p. 370.) We hold that requiring and using drainage improvements within a subdivision to convey water, including from an adjacent public road and adjacent subdivision, does not convert the improvements into public works either. As the County puts it, "Drainage improvements in all developments are designed to accommodate the anticipated storm water runoff quantities to be received by the development—including any runoff flows emanating from beyond a subdivision's boundary." Further, because developments "disrupt the natural drainage patterns," "installation of artificial drainage facilities that collect and convey the runoff" that before "may have been conveyed as natural sheet flows" is necessary "to ensure the waters will safely pass through the community without causing damage."

**2.** *That the Drainage Improvements Serve Some Off-Subdivision Needs Does Not Convert Them into Public Works.*

Contrary to Owners' arguments, requiring artificial drainage facilities and conveying water across properties over which it might not have flowed when the area was undeveloped does not convert those improvements into public works. Development requires that drainage systems be constructed to channel water beneath or around the obstacles development creates. A government could not require owners whose properties are not adjacent to a natural watercourse (i.e., landlocked) to drain waters from their properties into such a watercourse without allowing them to flow through properties that are closer to and/or adjacent to the watercourse. Thus, waters from landlocked properties must at least sometimes be conveyed through drainage improvements on other properties to reach a natural watercourse. This is recognized by the County in its ordinance regarding conveyance of surface waters, which provides that when "surface waters must be collected or conveyed beyond the boundaries of the subdivision in order to discharge into a natural watercourse," appropriate easements must be obtained from "all property owners between the boundaries of the subdivision and the point at which the surface waters will be discharged into a natural watercourse."

For these reasons, it is not surprising that the Subdivision Map Act contemplated that improvements would be used for the good of the subdivision and properties beyond it. Its aim was to require local governments to exercise control over " 'the design of subdivisions for the benefit of *adjacent landowners*' " as well as " 'prospective purchasers and the public in general' " (*Gardner, supra*, 29 Cal.4th at p. 997.) It defined "[i]mprovement" to include work "necessary for the general use of the lot owners in the subdivision *and local neighborhood . . . needs*." (§ 66419,

26

subd. (a), italics added.)  As a leading commentator has put it, "[t]he local authorities have a great deal of latitude to require a subdivider to make adequate arrangements for drainage and sewage disposal both within and outside of the subdivision."  (7 Miller & Starr, Cal. Real Estate, *supra,* § 20:30.)

A rule that government-required improvements on one subdivision are public if they serve drainage needs of properties outside that subdivision or convey water that might not naturally have flowed through the servient subdivision would undermine the purposes of the Subdivision Map Act. Indeed, local governments would be reluctant to " 'facilitate orderly community development, coordinate planning with the community pattern . . . , and assure proper improvements are made' " (*Gardner, supra,* 29 Cal.4th at pp. 997-998) if doing so would impose responsibility and the associated costs on them for maintaining and repairing all such improvements.

Owners contend our decision in *DiMartino, supra,* 80 Cal.App.4th 329 supports the rule they propose because it "distinguished the installation of drainage improvements by private property owners to achieve private objectives from County-mandated drainage improvements required by public entities to achieve public objectives."  Owners misconstrue what we decided in *DiMartino.*  In concluding the drainage pipe installed under the plaintiffs' house was not a public work, this court focused on whether the city had played any role in *constructing* that pipe and concluded the evidence did not show that it had.  (*Id.* at pp. 336-344.)  We referred to the purpose for which the pipe was built simply as evidence that it had been installed by an earlier owner of the lot.  We did not hold or suggest that improvements that serve

drainage needs that extend beyond the subdivision are necessarily public works. (*Id*. at p. 344.)

On the contrary, as the County points out, in *DiMartino* we rejected the argument that "connection of a private pipe segment to an admittedly public pipe segment converts the former to a public improvement." (*DiMartino, supra,* 80 Cal.App.4th at p. 343; see also *Ruiz*, *supra*, 47 Cal.App.5th at p. 518 [fact that pipe was part of system that was used to drain valley watercourse, even over an extended period, did not constitute implied acceptance of drainage easement].) We further observed that "such a rule would allow circumvention of the Subdivision Map Act: a developer would no longer need to comply with requirements of dedication and acceptance, connection of any pipe on private property to a public roadway cross-culvert would transform the private pipe to a public one. We have found no case recognizing such a doctrine." (*DiMartino,* at p. 343.)

Owners also contend there is a triable issue here because the County "both refused to either 'accept or reject' the drainage easements [it] required developers to place over the bed and banks of the Creek" and therefore may have effectively accepted them and converted the improvements and the Creek into public works. Owners disregard the well-established rule that an acceptance of an offer to dedicate must be unqualified and unequivocal. (See *Mikels v. Rager* (1991) 232 Cal.App.3d 334, 353-354 [valid acceptance of offer must be "absolute and unqualified"]; *Flavio v. McKenzie* (1963) 218 Cal.App.2d 549, 551-552 [" 'To effect a dedication of land by a private owner to public use, it is essential that there be an unequivocal offer of dedication by the owner and an unequivocal acceptance of the offer by the public' "].) " 'A dedication without acceptance is, in law, merely an offer to dedicate, and such an offer does not impose any burdens nor confer any

rights, unless there is an acceptance.' " (*Mikkelsen v. Hansen* (2019) 31 Cal.App.5th 170, 176.)

With respect to the drainage improvements on MS 102-72, the County did not accept the offer for the purpose it was offered, i.e., to access the improvements. It accepted the offer *only* for the purpose of recording the deed. An acceptance "for recording only" is not the kind of unequivocal and unconditional acceptance required to create a valid dedication. As for Subdivision 4983, the County stated it "*did not accept or reject* on behalf of the public any of the streets, roads, avenues or easements shown [on the Final Map] as dedicated to public use." This was not an unequivocal or absolute acceptance. Given that the offer was irrevocable, declining to accept or reject it left open to the County the option to accept it at some later time. It is undisputed that it never expressly did so.

Although there can be implied acceptance of an offer of dedication, it is undisputed that the County made no effort to maintain or repair the Spillway, any other improvements or the Creek itself. "Absent an easement or accepted dedication, liability is imposed on a public entity only when the public entity has exercised dominion and control over the private property." (*Ruiz, supra,* 47 Cal.App.5th at p. 523.) In other words, in the absence of an express acceptance, there must be evidence of implied acceptance of dedication through, for example, the public entity's assumption of maintenance or repair of the property. (*Ibid.*) In *Ruiz,* the court held the fact that public water drained through a privately owned pipeline did not constitute an implied acceptance of an offer of dedication that the public entity had previously expressly rejected. (*Id.* at p. 517.) The court indicated a previous case answered the question of "how much more" was required to constitute an implied acceptance, noting that in the earlier case "the public

29

entity was substantially involved in installing the privately owned pipe. For example, a surveyor employed by the public entity instructed the property owner ' "exactly what pipe to lay and how to do it" ' and "provided the trucks, dirt, and water to complete the installation." (*Id*. at p. 518.) There is no similar evidence here, and the County has provided evidence showing that it never owned, constructed or repaired the drainage improvements.[6]

### 3. *There Was No Implied Acceptance of the Drainage Easements by the County.*

Owners further contend they have raised a triable issue of fact as to whether the County otherwise assumed control or maintenance of the spillway because (1) it required the developer to install the drainage improvements; (2) its acceptance of the easements for MS 102-72—for recording only—suggests it impliedly accepted the easement; (3) there is a letter from the developer's engineer to the County purportedly confirming the County's obligation to maintain the drainage system; and (4) the October 22, 1975 subdivision agreement confirmed that the County would assume responsibility for the drainage improvements after one year.

We begin with the first two points. As we have explained, under *Locklin* and other cases, requiring improvements and easements does not convert the improvements into public works. It is likewise insufficient to constitute implied acceptance. To hold otherwise would be an end run

---

[6] Owners also argue that in requiring the dedication of the drainage easements, the County's "purpose" was "to ensure [it] would have access to the system in perpetuity to perform periodic maintenance," citing the declaration of Flett, their civil engineering expert. Even if the Flett declaration had been competent evidence of the County's purpose or intent (which we discuss further below), it would not matter. " '[A] dedication, like a contract, consists of an offer and acceptance, . . . proof of which must be unequivocal.' " (*Biagini v. Beckham* (2008) 163 Cal.App.4th 1000, 1009.) A party's unstated purpose or intent is not acceptance of an offer.

around those cases.  As we have discussed, *Ullery* and *Ruiz* indicate the kinds of conduct necessary for implied acceptance, such as substantial involvement in construction of the improvement or performing "maintenance and repair work."  (*Ullery*, *supra*, 202 Cal.App.3d at p. 568; accord, *Ruiz*, *supra*, 47 Cal.App.5th at p. 523 ["Absent an easement or accepted dedication, liability is imposed on a public entity only when the public entity has exercised dominion and control over the private property"].)  The undisputed evidence shows the County did not construct the improvements and performed no maintenance or repair work on the improvements.

Turning to the third item, the letter from the developer's engineer, that letter is not competent evidence that the County *agreed* to maintain the spillway.  In the letter, the engineer provided the County with a cost estimate of the improvements for MS 102-72 and stated, "The following also includes the drainage system which will lie within dedicated easements in said subdivision and which shall be maintained by the county *upon acceptance.*"  (Italics added.)  The County objected to the letter as lacking foundation and improper opinion.  The trial court did not rule on the objection but concluded the letter was not evidence of an agreement by the County that the drainage improvements would become public and be maintained by the County.  We agree.  The engineer is not a party to the subdivision agreement with the County, and his letter does not refer to that or any other agreement between the developer and the County. The engineer's assertion may simply reflect an assumption or prediction that the easements would be accepted by the County.  It is not evidence that the County agreed to accept the offer of dedication.

Finally, Owners argue that the County's agreement to maintain the drainage improvements was "reaffirmed, albeit ambiguously, by the

31

October 22, 1975, subdivision agreement" between the County and the developer for MS 102-72. The agreement includes a provision that following the completion of work (including the drainage improvements) for MS 102-72, the developer agreed to maintain the work and repair any defects for a one-year period. Owners argue the implication was that the County would assume maintenance of the drainage system after the one-year period. The inference Owners suggest we draw is not a reasonable one. The provision for a one-year period guaranteeing the adequacy of the improvements, which is required by county ordinance, is essentially a warranty that the improvements will work and, that if they fail during the warranty period, the developer will repair any defect. The Subdivision Map Act contemplated local governments would take steps to ensure that subdividers performed the obligations they undertook, including to construct required improvements. (See §§ 66499 et seq.; 74 Ops. Cal. Atty. Gen. 89 (1991).) The duration of a warranty or guarantee has no tendency to show the local government agreed to accept long-term responsibility for the improvements the subdivider warranted.

### B. Plaintiffs Have Not Established a Triable Issue As to Whether the Creek Was Incorporated into the Public Drainage System.

Owners separately contend a triable issue of fact exists as to whether the Creek has been incorporated into the public drainage system through the Government Entities' management of Drainage Area 46. Specifically, Owners argue that through their management, defendants are (1) requiring property owners developing parcels within the watershed to drain increased surface water runoff into the Creek; (2) collecting drainage fees from property owners for this use; and (3) choosing not to require property owners to install mitigation measures to reduce downstream runoff.

32

Owners' first point lacks merit, as "[u]tilizing an existing watercourse for drainage of surface water runoff and requiring other riparian owners to continue to do so does not transform the watercourse into a public storm drainage system." (*Locklin, supra,* 7 Cal.4th at p. 370.) There must be some *affirmative* action by the public entity to assume ownership or responsibility of the watercourse. (*Ibid*.) Here, neither the County nor the District had any ownership interest in the Creek nor performed any maintenance on the Creek on or upstream of Owners' properties. Owners' reliance on *Souza v. Silver Development Co., supra*, 164 Cal.App.3d 165 is unavailing. There, this court found there was sufficient evidence to support the trial court's finding that a creek had been incorporated into the public drainage system because the city "required the developer to construct storm drains to carry surface water into the creek *and accepted* the dedication of those drains." (*Id*. at p. 170, italics added.) The city also required *and accepted* an easement for drainage along the creek channel. (*Ibid*.) Such express acceptance is wholly absent here.

Second, the evidence shows that the Government Entities do not provide any storm drainage services to Owners' properties or any upstream properties within the watershed. The "drainage fees" Owners reference are fees that the District collected pursuant to the Drainage Fee Ordinance enacted in 1988. The fees are imposed on all new development in Drainage Area 46 based on a dollar amount of square foot of impervious surface area developed. Revenue generated from these fees was placed in a fund intended to cover a local match that was required to implement a flood protection project. The project was not implemented because it did not meet federal requirements, and the District is now working with the City of Pleasant Hill

33

to determine whether to create a new drainage plan that would include new, proposed drainage improvements.

The District's act in implementing and collecting drainage fees to fund a proposed project that was never built does not raise a triable issue as to whether the District or the County incorporated the Creek into a public drainage system. Finally, that the Government Entities allegedly could have but did not require upstream property owners to install mitigation measures to offset the downstream runoff is not an *affirmative* act that demonstrates public control or dominion over the Creek. (*Locklin, supra,* 7 Cal.4th at p. 370.)

### C. There Is No Triable Issue of Fact Under the *Locklin* Reasonableness Test Because that Test Does Not Apply Unless There Is a Public Improvement.

Owners next argue that even if the Government Entities' management of Drainage Area 46 did not incorporate the Creek into the public drainage system, there is still a triable issue of fact as to whether their management of Drainage Area 46 was unreasonable to support liability under the "reasonableness" test set forth in *Locklin, supra,* 7 Cal.4th 327. Owners concede that the surface water entering the Creek does not drain from any publicly owned land but argues it does "emanate from improvements constructed on private parcels under the direct supervision of Respondents."

In *Locklin*, our Supreme Court explained that "[b]ecause a public agency, like any riparian property owner, engages in a privileged activity when it drains surface water into a natural watercourse or makes alterations to the watercourse, article I, section 19, of the California Constitution mandates compensation only if the agency exceeds the privilege by acting unreasonably with regard to other riparian owners." (*Locklin, supra,* 7 Cal.4th at p. 367.) To determine reasonableness, the court set out the

34

following six factors:  "(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3) the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff." (*Id*. at pp. 368-369.)

"However, in determining whether [a public entity] acted unreasonably in this context, 'the critical inquiry' is not whether the public entity acted reasonably with respect to someone else's property, but whether 'the [public entity] acted reasonably in its maintenance and control over those portions of the drainage system *it does own*.' " (*Ruiz, supra,* 47 Cal.App.5th at pp. 526-527, italics added.)  Similarly, as Division Three of this court has held, "Where a *public improvement* is unreasonably a substantial cause of the plaintiff's damage, a public agency may be liable for its role in diverting surface water in order to protect urban areas from flooding." (*Skoumbas v. City of Orinda* (2008) 165 Cal.App.4th 783, 796, italics added.)  Thus, only where the public entity owns the property that has caused the harm or by conduct converts that formerly private property into a public work is the reasonableness of the public entity's and the private owner's conduct assessed.  Because we have held as a matter of law that neither the drainage improvements nor the Creek was or became a public work, the "reasonableness" test set forth in *Locklin* is not implicated.  There is therefore no triable issue of fact raised by this argument.

35

# V.

***The Exclusion of Flett's Custom and Practice Opinion About Homeowners' Associations Was Harmless Because It Did Not Raise a Triable Issue Whether an Agreement Was Formed.***

Owners contend the trial court abused its discretion in sustaining the objection to a paragraph in their expert Flett's declaration, without explanation. As we have recognized elsewhere, there is a debate as to whether the abuse of discretion standard of review that generally applies to evidentiary rulings should be applied in the context of summary judgment, where review is generally de novo. (*Turley v. Familian Corp.* (2017) 18 Cal.App.5th 969, 978.) Owners do not argue we should review the trial court's evidentiary ruling de novo here, " 'except to the extent the ruling is based on the court's conclusion of law.' " We need not decide what standard of review applies to evidentiary rulings made in the summary judgment context because any error in excluding the opinion in Flett's declaration was harmless.

The trial court excluded Flett's opinion that if the County had intended for the drainage improvements in MS 102-72 to be private, it would have included in the conditions for approval of the subdivision map a requirement that the property owner assume responsibility for maintaining the drainage system rather than requiring an irrevocable offer to dedicate the drainage easements to the County. Flett stated this was the custom and practice of the County and its failure to include a requirement that the owner form a homeowners' association to take responsibility for the drainage improvements shows the County intended to take responsibility for them. Owners reprise this argument on appeal, arguing, "the absence of a County requirement that [the subdivision developer] establish a homeowners'

36

association for the MS 102-72 subdivision to provide for the maintenance of the drainage system is evidence that the County agreed to maintain it."

The Flett opinion, even if admitted, would fail to raise a triable issue because it exceeds the permissible use of custom and practice evidence. Generally, offers of dedication are governed by contract principles. (*Mikels v. Rager*, *supra*, 232 Cal.App.3d at pp. 353-354 & fn. 3.) Such offers must be accepted before they create binding obligations, and a "qualified acceptance of the offer of dedication [does] not result in a completed dedication of a public easement." (*Id.* at p. 353; *Biagini v. Beckham, supra,* 163 Cal.App.4th at p. 1009; *Copeland v. City of Oakland* (1993) 19 Cal.App.4th 717, 722 [conditional nature of public entity's acceptance prevents creation of public liability for street].)

Under general contract interpretation principles, "[i]t is a well-established rule that evidence of usage and custom may be introduced as an instrument of interpretation, but *may not be used to create a contract*." (*Magna Development Co. v. Reed* (1964) 228 Cal.App.2d 230, 240, italics added; *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 817.) Equally well-established is the rule that terms of a contract may be implied from custom and usage evidence only " '*in the absence of agreement to the contrary*.' " (*Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 851, italics added; *Miller v. Germain Seed & Plant Co.* (1924) 193 Cal. 62, 77; see Civ. Code, § 1655; 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 778, pp. 836-837.)

Applying these principles, custom and usage evidence cannot be used to establish an acceptance of the offers to dedicate easements or the formation of any other agreement to maintain the improvements on the dedicated property. For that reason alone, Flett's opinion about the "intent" of the

37

County, which he infers from the absence of a homeowners' association requirement, does not create a triable issue as to whether the County accepted the offers and thereby undertook to maintain the drainage improvements.

There is another reason the Flett opinion does not raise a triable issue regarding the MS 102-72 subdivision, which is that the term he would imply conflicts with the express terms of the parties' agreement. As we have discussed, in the offer to dedicate, the subdivision developer provided, "It is understood and agreed that CONTRA COSTA COUNTY and its successor or assign *shall incur no liability with respect to such offer of dedication, and shall not assume any responsibility for the offered parcel of land or any improvements thereon or therein*, until such offer has been accepted by appropriate action of the Board of Supervisors, or of the local governing body of its successor or assign." (Italics added.) The parties thus agreed that the County would not become responsible for the improvements unless its Board of Supervisors took appropriate action to accept the offer of dedication. A term requiring the County to bear that responsibility without any acceptance by the Board is contrary to the parties' express agreement and therefore cannot be implied based on custom and practice evidence.

In short, Flett's opinion about custom and usage fails to raise a triable issue because it cannot be used for the purposes for which it was offered: either to imply an acceptance by the County of the offers of dedication and associated responsibility for the drainage improvements or to imply a term imposing such responsibility by means other than those specified in the actual agreement. For these reasons, any error in excluding that opinion is harmless.

## VI.

### *Plaintiffs Concede Their Tort Claims Fail If the Inverse Condemnation Claim Is Not Viable.*

Lastly, Owners concede their related tort causes of action for nuisance, trespass, and dangerous condition on public property are all conditioned on the viability of their inverse condemnation claim. For example, Owners argue that they have a claim for nuisance *if* it is proven that either the drainage improvements or the Creek is part of the public drainage system. Because we conclude they are not, Owners' tort claims also fail.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.

_____

                              STEWART, P.J.


We concur.


_____

RICHMAN, J.


_____

MILLER, J.


*Shenson v. County of Contra Costa* (A164045)

Trial Court: Contra Costa County Superior Court

Trial Judge:        Hon. Jill C. Fannin

Counsel:

Seiler Epstein, MacKenzie & Albritton, Mark L. Mosley, for Plaintiffs and Appellants.

Bold, Polisner, Maddow, Nelson & Judson, Timothy J. Ryan, for Defendant and Respondent.